WILLO V. NEWMAN, *Appellant*, v. MARGARET F. SMITH AS EXECUTRIX OF THE ESTATE OF L. W. SMITH, DECEASED, *Appellee*.

Opinion filed May 14, 1919.

Petition for Rehearing denied June 19, 1919.

1. In order to constitute a sound disposing mind, a testator must not only be able to understand that he by his will giving the whole of his property to one object of his regard, but he must also have capacity to comprehend the extent of his property, and the nature of the claims of others, whom, by his will, he is excluding from all participation in that property.

2. It is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must have sufficient active

memory to collect in his mind, without prompting, the particulars or elements of the business to be trancactetd, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them.

3.  An entire change from former testamentary intentions, is a strong circumstance to support a claim of undue influence.

4.  Where there is an insane delusion in regard to one who is the object of the testator's bounty, which causes him to make a will which he would not have made but for that delusion, such will cannot be sustained.

5.  Where the fact that the testator has been subject to any insane delusion has been established, a will should be regarded with great distrust, and every presumption should in the first instance be made against it.

6.  Undue influence can seldom if ever be established by direct evidence, but may be shown by its results, and it may become the only legitimate inference from the facts and circumstances in the case.

7.  A will should not be disturbed because it is unreasonable and unjust, but where as in the instant case it does violence to the natural instincts of the heart, to the dictates of fatherly affection, to natural justice, to solemn promises, and to moral duty, such unexplained inequality and unreasonableness is entitled to great influence in considering the question of testamentary capacity and undue influence.

8.  Apparent inequality or unreasonableness in a testamentary disposition is entitled, in proportion to its degree of flagrancy, to some auxiliary influence on the question of capacity, or fraud or controlling influence; and, unexplained and combined with other corroborating evidence, it may be entitled to great influence.

Judgment reversed.

*William Hocker* and *O'Doherty & Yonts,* for Appellant;

*E. B. Drumright* and *Herbert S. Phillips,* for Appellee.

BROWNE, C. J.—On December 7, 1914, the last will and testament of L. W. Smith was admitted to probate by the County Judge of Hillsborough County, and on the same day letters testamentary were issued to Margaret F. Smith, the testator's widow, who was the sole beneficiary under the will.

The will was executed in Tampa, Florida, on the 27th of February, 1913. On the 26th day of January, 1915, a petition was filed with the County Judge by Mrs. Willo V. Newman, the only child and sole heir-at-law of Mr. Smith, praying for the revocation of the probate of the will because it "was not in truth and in fact the genuine will of the said L. W. Smith, nor did the same truly express the purpose or intention of the said L. W. Smith in respect to the disposition of his property, for the reason that while the said instrument was signed by the said L. W. Smith, he was at the time of execution thereof in a hospital in the City of Tampa, and so under the influence of opiates and anodynes as to be incapacitated from making a testamentary disposition of his property, and it was at all times prior to the execution of the said instrument and at the time of execution thereof the purpose and intention of the said L. W. Smith to make a testamentary disposition of his property whereby your petitioner, his daughter, should receive one-half thereof, and the said Margaret F. Smith, your petitioner's step-mother, the remaining one-half thereof, and the execution

of the said instrument so admitted to probate was se-
cured by undue and improper influence exercised upon
the mind of the said L. W. Smith while he was so in the
hospital and under the influence of opiates and anodynes,
and not possessed of sufficient mental vigor to withstand
such improper and undue influence."

These allegations were denied by the executrix.

Testimony was taken and on the 24th of March, 1916,
the County Judge entered his decree that the instrument
theretofore admitted to probate was not the last will and
testament of L. W. Smith and revoked the probate of said
instrument.

On appeal to the Circuit Court for Hillsborough Coun-
ty the judgment of the County Judge was reversed and
the cause remanded with directions that the petition by
Mrs. Willo V. Newman be denied and her contest be dis-
missed. From this judgment the contestant appealed.

Several errors are assigned, but as they all deal with
the question of undue influence and lack of testamentary
capacity, they will be considered together.

The testator was a man well advanced in years. He
had been suffering from diabetes resulting in gangrene
of the foot and hardening of the arteries. He was taken
to a hospital early in February, 1913, and on the 24th his
toe was amputated. During the operation a condition
was discovered that made it necessary to amputate his
leg at the thigh in the hope of saving his life.

The will is dated February 27th, 1913, three days after
the first operation and shortly after he had been informed
that it was not a success and that he would have to under-
go a more serious operation. He suffered great physical

pain; was a very nervous man and exhibited an inordinate fear and apprehension about his physical condition; he particularly had a great fear of death and at the time he was in the hospital had this fear in rather an exaggerated form. His mind seemed to be centered on the one thought of his physical condition, and the possible nearness of death. Owing to these conditions narcotics had to be administered in rather large quantities.

Dr. Helms, his attending physician, testified: "During that period of time (including February 27, 1913, date of will) he was suffering pain and was seized with this inordinate fear, and his whole concern, so far as my observation, was upon his physical condition, whether or not he would get well, and necessarily he was incapable of any particular mental effort." Dr. Helms, after fully stating the facts upon which he based his opinion, testified that "Mr. Smith was not capable of making a will at that time; he wasn't sufficiently at himself; he wasn't sufficiently mentally capacitated to consider a matter of that kind, the fact is, he wasn't capacitated to consider any act that required mental capacity, in my judgment." On the day he made his will "he was suffering a great deal of pain, and was almost uncontrollable and had to have narcotics. On the 25th he had a quarter of a grain of morphine at three o'clock in the afternoon. On the 26th he had morphine at nine o'clock in the morning, two o'clock in the afternoon and seven o'clock in the evening. On the twenty-seventh, the day the will was made, morphine was given hypodermically at two o'clock in the morning and at nine-thirty.

Two physicians, Dr. Truelson and Dr. Anderson, were examined on behalf of the contestee in an effort to weaken the effect of Dr. Helms' testimony. Dr. Truelson tes-

tified that he visited Mr. Smith as a friend while he was in the hospital and that he did not observe anything that indicated loss of mental powers, or that he had lost his mind, and that he considered him rational, but at the close of his testimony he says that from the conversations with him while in the hospital he was unable to pass judgment on whether or not he was in full possession of his mental faculties at the time Smith was in the hospital between the two operations.

Dr. Lancaster was Dr. Helms' assistant. He admits that Smith was nervous and excited, but that it was not "unsusual or extraordinary excitement" or any "undue excitement."

It appears from the testimony that a quarter of a grain of morphine was administered to Smith at 2 A. M. and at 9 A. M. and at 6 P. M. on the day the will was made, and the same quantity on the day before.

Neither Dr. Truelson nor Dr. Anderson contradict any of the facts upon which Dr. Helms based his opinion. These facts show a mental and physical condition of the patient which precludes the probability that he was able to comprehend the situation and character of his property, the nature of his obligations to others, the persons who had legal and natural claims upon him who should be the objects of his bounty, and so keep these things in his mind, so as to be capable of making such a testamentary disposition of his property, as his own judgment approved. On the contrary, his predominant thought was dread of death, his sole concern was for his recovery. A person in this situation would not be apt voluntarily to contemplate the subject of his dissolution, still less to regard it as so near and impending as to require him to

plan what would become of his property after the dreaded event occurred.

The rule for testing testamentary capacity is thus stated by the great jurist, Lord Erskine: "But their Lordships are of the opinion, that in order to constitute a sound disposing mind, a Testator must not only be able to understand that he is by his Will giving the whole of his property to one object of his regard; but that he must also have capacity to comprehend the extent of his property, and the nature of the claims of others, whom, by his Will, he is excluding from all participation in that property; and that the protection of the law is in no cases more needed, than it is in those where the mind has been too much enfeebled to comprehend more objects than one, and most especially when that one object may be so forced upon the attention of the invalid, as to shut out all others that might require consideration; and, therefore, the question which their Lordships propose to decide in this case, is not whether Mr. Baker knew when he was giving all his property to his wife, and excluding all his other relations from any share of it, but whether he was at that time capable of recollecting who those relations were, of understanding their respective claims upon his regard and bounty, and of deliberately forming an intelligent purpose of excluding them from any share of his property.

"If he had not the capacity required, the propriety of the disposition made by the Will is a matter of no importance. If he had it, the injustice of the exclusion would not affect the validity of the disposition, though the justice or injustice might cast some light upon the questions as to his capacity." Harwood v. Baker, 3 Moore 282, 13 Eng. Rep. (Full Reprint) 117.

A like rule governs the courts of this country. "We have held that it is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must, in the language of the cases, have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things is, within the meaning and intent of the Statute of Wills, a person of sound mind and memory, and is competent to dispose of his estate by will." Delafield v. Parish, 25 N. Y. 9.

The testator in his life was a fairly successful business man. He and his wife had each been married before and each had a daughter living. Several years before the execution of the second will his wife made a trip to Europe and before leaving they each executed a will, the wife bequeathing one-half of her property to her husband and one-half to her daughter, and the husband bequeathing one-half of his to his wife and one-half to his daughter.

This will, as was said in the case of Tyler v. Gardiner, 35 N. Y. 559, "undoubtedly expressed the intelligent and deliberate purposes of the testatrix. The disposition which it made of her property was, obviously, equitable, rational and just."

Why was it changed?

There is not the slightest hint or suggestion in the record that any change in the financial circumstances of the daughter, or the affectionate relations between her and her father occurred after he made this will, that could have induced or influenced him to change it and disinherit his only and much loved child who was in poor financial circumstances, and leave all he possessed to his wife for whom he had slight regard.

That an entire change from former testamentary intentions is a strong circumstance to support a claim of undue influence is well supported by the authorities. Tyler v. Gardiner, *supra;* Delafield v. Parish, *supra;* Marsh v. Tyrrell, 2 Haggard 84, 4 Eng. Ecclesiastical, 33.

In Tyler v. Gardiner, *supra,* Mr. Justice PECKHAM delivered a strong dissenting opinion, but he recognized the weight of a previous will to show undue influence, and said: "In 1864, when this will was made, their circumstances had totally changed." Even the draft of a will which was never executed by the deceased but was made under his direction, has been held to be evidence upon the question of capacity and undue influence. Thornton v. Thornton, 39 Vt. 122.

He was very fond of his daughter and her husband. The testator had been separated from his first wife, and his daughter was raised by her aunt in Kentucky. After her marriage she and her husband made eight or ten trips to Tampa to visit Mr. Smith and he visited them twice in their home. He wrote her most affectionate letters, in which he told her that she would be taken care of after his death, and that she need not bother about money now because "your time will come some of these days in the near future and in a substantial manner." He made a list

of all the real estate that he owned, and gave it to his son-in-law and told him to take care of it as it would be to his and his wife's interest. In June or July, 1913, four or five months after the execution of the second will, he asked his son-in-law if he still had the list, and told him to keep it as it would be of much benefit to "Willo," as he called his daughter. To her he wrote, "I love you better than I do anyone on earth." In another letter he addressed her as "My dearest and only baby, for that is what you are and no one else is or ever will be entitled to that name." In the same letter he said: "You need pay no attention to what little I give other people. Your time will come some of these days and in a substantial manner." In another letter to her he thus referred to the wife who was the sole beneficiary under the will under consideration: "I feel like a 16 year old especially while the old lady is on the other side of the 'Pond.' Had a letter from her yesterday dated Apr. 5-'08, 2 P. M. Grand Hotel Baglioni, Florence, Italy. After touring that country she will be at Hotel Cecil, London, England, by May 5-1908, and will arrive in New York City, U. S. A. on or about July 1-1908, so I will have lots of fun yet while the old cat is away (*The Rats will play.*)"

Before his step-daughter married he wrote his daughter, "You can rest assured that if I had the $100,000.00 I should surely hold on to it and not give it to a preacher's son. I did not make my money out of preachers and do not intend to invest any money in them. When Charlie gets married she must move out of my home and root for herself; that is what I had to do and that is what you are doing." Alluding to her tendency to "fuss at him," he wrote "with all your faults I love you better than I do any one else on earth, so don't worry about me not loving

you." Shortly after this he wrote her: "Whenever I write anything that you think reflects on you and George you may swear it is only a joke, or that I am only joking, for which you know I am proverbial. Now cool off and don't be angry with your old 'Pappy.' If you are mad with me I love you just the same or more than ever. You need pay no attention to what little I give other people. Your time will come some of these days in the near future and in a substantial manner. * * *      .

"Yes the bride and groom returned from Havana, Cuba, two weeks ago today and are making their home with their mama and pappy for the present which means always I suppose. This is H—ll, ain't it?"

The will that we are asked to sustain, entirely ignored this daughter whom he so fondly loved, and so disposed of his property that his step-daughter, for whom he had scant regard, and the man whom he had not been on speaking terms with for several years, and who he said should never get any of his property, would in the natural course of events become the beneficiaries of the bequests to his wife.

His daughter learned from a friend in Tampa that her father was in a hospital. She sent several special delivery letters to him, some to his office, and others to his home. She also wrote Mrs. Smith two letters. She received no replies to any of them. She then wrote to the postmaster inquiring about her special delivery letters and he advised her that her father was sick in a hospital. She then wrote Mrs. Smith that she was coming to Tampa, when Mrs. Smith telegraphed that her father was getting along nicely and would be home in a few days. Mrs. Smith followed this up with a letter, the purpose of which

was manifestly to prevent the daughter from coming to her father, in which she told her the house was full, and she wanted to attend to him herself.

This testimony shows a plan on the part of Mrs. Smith to keep her husband's thoughts from turning towards his daughter, or if at intervals in his suffering and momentary lapses from his overmastering fear of death a vagrant thought of her should enter his mind it would be met with the thought of her neglect in not coming to his sick bedside or sending him any message expressive of her sympathy or concern for him. As long as the daughter wrote affectionate letters expressive of her anxiety they were ignored, but when she announced her intention of coming to him, a telegram was flashed back to prevent it.

His wife was in good financial circumstances, having an income of something over $6,500.00 per annum, while his daughter had an income of about $30.00 a month and her husband was working for a salary of $125.00 a month.

Two witnesses testified to alleged conversations with Mr. Smith after he came out of the hospital, in which he acknowledged having made a will. One of these witnesses, Mr. Law, married Mrs. Smith's sister, the other, Mr. Thrower, married Mrs. Smith's daughter.

The witness Law says that he got to talking to Mr. Smith and happened to talk about making wills, and he asked if he had made one, and that Mr. Smith said "Yes," and he asked "who he made it to," and he said, "I gave everything to 'mammy,' that is what he called his wife." He asked why he did not give his daughter by his former wife something, and he said: "Well when we parted she went with her mother and I gave her everything I had."

If this conversation occurred, Smith was then laboring under a delusion, because the testimony discloses that when Smith and his first wife parted he did not give his daughter anything, nor did she "go with her mother," but was taken by her aunt when about a year old, with whom she lived until she was married.

Lawrence Thrower, the son-in-law of the sole beneficiary under the will, also casually asked Mr. Smith if he made a will, and he said "Yes." Thrower replied he did know that. Smith then told him that he made it while in the hospital. Thrower then asked him if he wasn't going to give his daughter anything? Smith said "No," and Thrower asked him why, and he said that "he didn't have anything much, and that he was indebted to Mammy, and that his daughter had plenty, more than both of them put together." We glean from the testimony that Mrs. Smith's property at this time was worth approximately a hundred thousand dollars, and at the time Smith gave Newman a list of his property he considered it worth over a hundred thousand dollars. His daughter had an income of $30.00 a month.

In considering the testimony of these witnesses, we cannot escape one of three conclusions: That Smith was laboring under an insane delusion that might naturally have influenced him in making his will; that he told a deliberate falsehood, or that these alleged conversations never occurred.

If we accept the first, it establishes his lack of testamentary capacity, as it is a well settled rule "abundantly sustained by the rulings of other courts of the highest respectability, that where there is an insane delusion in regard to one who is the object of the testator's bounty,

which causes him to make a will which he would not have made but for that delusion, such will cannot be sustained." American Bible Soc. v. Price, 115 Ill. 623, 5. N. E. Rep. 126.

"No doubt, where the fact that the testator has been subject to any insane delusion is established, a will should be regarded with great distrust, and every presumption should in the first instance be made against it. Where insane delusion has once been shown to have existed, it may be difficult to say whether the mental disorder may not possibly have extended beyond the particular form or instance in which it has manifested itself. It may be equally difficult to say how far the delusion may not have influenced the testator in the particular disposal of his property. And the presumption against a will made under such circumstances becomes additionally strong, where the will is, to use the term of the civilians, an inofficious one; that is to say, one in which natural affection and the claims of near relationship have been disregarded." Banks v. Goodfellow, L. R. 5 Q. B. Cas. 549; Boughton v. Knight, L. R. 3 P. & D. 64.

If the testimony of Thrower and Law is true, Mr. Smith at the time he made the will, and thereafter, was laboring under the insane delusion that his daughter was possessed of a handsome fortune, whereas in truth she had an income of only thirty dollars a month.

There is nothing in the record to justify our accepting the second conclusion and branding Mr. Smith as unworthy of belief.

If we accept the third, it is a very strong and controlling circumstance to establish the contention of the appellants that Mrs. Smith's family were in a conspiracy to

prevent Mr. Smith's daughter from getting any part of his estate and that the will was a culmination of such conspiracy.

Mr. Himes, who drew the will, says that he received a telephone message from one of the Thrower Brothers, whom he thinks was B. K. Thrower, telling him that Mr. Smith was in the hospital and wanted to see him in order to draw his will. That one of the brothers came to his office "and he had a conversation with him." What that conversation was does not appear, but it is a reasonable inference that it was about the disposition of his property, because Mr. Himes said, "when I entered the room in the morning Mr. Smith was lying in his bed. Apparently he had no difficulty in recognizing me. There was very little conversation on that visit. I told Mr. Smith, after speaking to him and expressing my regrets at seeing him in the hospital and the condition he was in, that I had understood he wanted me to come and prepare his will and he replied yes that was true. *Whether he then told me what he wanted put in the will or whether I told him what I understood he wanted put in the will,* I don't remember, but I know aside from the matter of all the property being given to Mrs. Smith I asked if he wished her to be relieved from the necessity of giving a bond and being made executrix, and he answered in the affirmative. At that time Mr. Smith talked to me more about his physical condition than he did about the details of his will. I remember he told me at that time they had cut into his foot and found he didn't have any blood in it, or circulation, and they would have to cut off his leg, and so on, and in the afternoon when I came back he again recognized me when I came into the room without apparently any difficulty. In the afternoon there was no discussion about

anything about the will. I think I did the principal part of the talking. I know I mentioned the necessity for a witness and I know that I read the will and explained it to him and asked him if that was his will and he so declared· Nothing occurred at that time to raise in my mind any question about his mental competency. At that time I certainly thought he was competent to make a will or I certainly would not have drawn it or had him execute it. In my opinion there is nothing more reprehensible for a lawyer than to have a man sign a will knowing he was not competent to do so and not conscious of what was going on. As to an opinion on my part as to his mental ability at that time to make a will, I made no study of it other than I have told you and know nothing about what occurred except in my presence and I can't say that I undertook to form an opinion. In my judgment an opinion ought to be based on a knowledge of all the facts in order to arrive at a correct conclusion and no such necessity was presented to me or came into my mind at that time.''

Mr. Himes corroborates Dr. Helms' testimony that Mr. Smith's mind was absorbed with his physical condition, because he says that "At that time Mr. Smith talked to me more about his physical condition than he did about the details of his will." He further testified that he asked Mr. Smith if he wanted his wife to be relieved from the necessity of giving a bond, and her being made executrix, and "he answered in the affirmative." This shows a responsiveness to suggestion which thoroughly accords with the theory of the contestants that the testator was in a state of mind that would cause the careless dismissal of every disquieting thought and ready acquiescence to extraneous suggestion·

Mr. McIntosh, Mr. Smith's book-keeper up to the time he retired from active business, and who shared an office with him, visited Smith several times while he was in the hospital, and his testimony supports the conclusion that we draw from that of Mr. Himes that Smith at this time was in an acquiescent state of mind yielding readily to suggestion and unable or unwilling to undertake initiative thought or independent mental action. He testified: "I did his banking for him and he would sign the checks and when I would ask him about things he would give me instructions what to do and speak to me for a minute and then like a man in that condition, weak, sick or under an opiate, whatever it might be, would doze off again and then when I would speak to him rouse up with a slight start, but was always clear in all he said.

"Q. Did he take any interest in the various transactions you went to him about when he was in the hospital? A. Practically none at all. *He just simply would sign anything I gave him to sign*—papers or checks or anything.

The acquiescent condition of mind produced by morphine is thus stated by Dr. Helms: "Q. Would you say that the administration of morphine was calculated to cause a person to do things under such influence that he otherwise would not do?   Yes.  I have seen Doctors give patients morphine in order to get them in the notion of being operated on to carry them to the hospital."

Dr. Helms had previously testified "I used more morphine in L. W. Smith's case than any case I remember of in the hospital since the establishment of the hospital."

Several witnesses testified that in their opinion Mr. Smith was in possession of his mental faculties when they saw him in the hospital, and it may be that at such times Mr. Smith was in a more normal condition, but it is well

recognized that "a man may at one time be competent and at another incapable—one who in his normal state is perfectly competent may be wholly incompetent when under the influence of wine, or opiates, or fever or other severe and painful disease." Longford v. Purdon, L. R. 1 Irish 75.

To reach a proper conclusion we must consider undue influence and mental capacity together. The testimony discloses that a potent influence was at work to secure the execution of this will, and that everything connected with it emanated from some one other than the testator. Someone, not the testator, selected the time for making the will when his mind was fixed on his physical condition and he was in great fear and dread of death to the exclusion of other matters—a time when he was under the soothing and drowsy influences of morphine that had been administered three times a day for several days; someone, not the testator decided to have the will made; someone, not the testator sent Thrower to tell Mr. Himes to go to the hospital; and someone, not the testator, told him what disposition was to be made of his property. From the beginning to the end of the transaction the testator was merely a passive instrument in the hands of someone, and we cannot escape the conclusion that the will was not his spontaneous act. Jarmon on Wills (6th ed.) 49; Tribe v. Tribe, 1 Rob. 775, 13 Jur. 793; Dufaur v. Croft, 3 Moore, P. C. 136, 13 Eng. Rep. (Full Reprint) 59; Longford v. Purdon, *supra*.

In Dufaur v. Croft, *supra,* Lord Basanquet said the question was whether the evidence was sufficient to satisfy a court of probate that the contents of the codicil "originated with the testator, or were adopted by him at a time when he was in a condition to exercise and did ex-

ercise, thought, judgment and reflection respectiing the act which he was doing and the contents of the paper which he signed." There is not a scintilla of evidence that the disposition made of his preperty or any act in connection with the making of the will, originated with the testator.

The disposition of the property was in derogation of the public policy announced in our statutes of descent; it did violence to the dictates of natural affection; it repudiated all his former protestations of love for his child; it broke promises iterated and reiterated that he would provide for her after his death. Undue influence can seldom if ever be established by direct evidence, but we often find it conclusively shown by its results, and it may become the only legitimate inference from the facts and circumstances in the case. Here it changed the disposition of the property that was fair, and prompted by the dictates of affection and regard for those having claim on the testator's bounty, to one where these were flagrantly violated, and it disregarded the moral obligation resting upon him to carry out his promises so often made to provide for his child after death. We do not mean to say that a will should be disturbed merely because it is unreasonable and unjust, but where as in the instant case it does violence to the natural instincts of the heart, to the dictates of fatherly affection, to natural justice, to solemn promises, to moral duty, such unexplained inequality and unreasonableness is entitled to great influence in considering the question of testamentary capacity and undue influence.

"But apparent inequality or unreasonableness in a testamentary disposition is entitled, in proportion to its degree of flagrancy, to some auxiliary influence on the ques-

tion of capacity, or fraud, or controlling influence; and, unexplained and combined with other corroborating evidence, it may be entitled to great influence.    This is the uniform and undeviating doctrine of this Court; and it was never in any instance, when rightly understood, adjudged otherwise."    Kevil v. Kevil, 2 Bush (Ky.) 614.

"In doubtful cases, the reasonableness or not of a will, in its various provisions, is entitled to great weight." Jarmon on Wills, R. & T.'s notes p. 75.

"Besides, the will itself is unreasonable on its face, when taken in connection with the amount of his property and the situation of his relatives; and this is always proper evidence to be taken into consideration in judging of the state of the testator's mind."    Chancellor Walworth, in Clark v. Fisher, 1 Paige's Ch. (N. Y.) *171.

"The unnatural exclusion, by a testator, of his only daughter, with whom he seems to have had no difficulty, to whom he had never given more than a very trifling pittance, and who was in need of aid from him, from a just and equal share of his estate, is a strong circumstance to show either mental incapacity, or undue influence."    Reynolds v. Root, 62 Barb. (N. Y.) 250.

In reaching a conclusion, from the evidence in this case, we do not have to rely upon one circumstance alone to establish mental incapacity and undue influence.    Their *indicia* are numerous.    A much loved and needy daughter disinherited;    an affluent wife held in slight regard,    given all his property; a former will, equitable, rational and just, disregarded; solemn promises broken; the ties of fatherly affection destroyed; the total absence of spontaniety on the testator's part to anything connected with the making of the will or its contents; dubious testimony to support

the will that would strain to the utmost the credulity of the most trustful; letters and telegrams sent to the father intercepted, and ignored until the wife is advised that the daughter is coming to her father at once and then a telegram promptly sent to prevent her coming. In this condition of the testimony do we need the opinion of physicians as to the mental capacity of the testator? And if we do, shall we accept that which accords with all the other facts, or that which does violence to them? The facts in this case speak so strongly that we would have reached the same conclusion without Dr. Helm's opinion, which fortifies but does not control our judgment that this will is the result of undue influence exerted upon a mind not possessed of testamentary capacity at the time it was executed.

The judgment of the Circuit Court is reversed, with directions to affirm the judgment of the County Judge's Cout that the instrument theretofore admitted to probate was not the last will and testament of L. W. Smith, and revoking the probate of the same.

TAYLOR AND ELLIS, J. J·, concur.

WHITFIELD AND WEST, J. J., dissent.

WHITFIELD, J., dissenting—The finding of the Circuit Judge reversing on appeal the finding of the County Judge, appears to be in accord with the preponderating weight and probative force of the evidence, therefore the decree rendered by the Circuit Judge on the evidence is in my opinion "such a decree as the court below ought to have given," within the requirements of Section 1707, General Statutes of 1906, Florida Compiled Laws, 1914.