JULIUS S. EDWARDS et al., appellants,

*v.*

THEODORE E. EDWARDS, respondent.

[Filed July 15th, 1901.]

Testator was ninety years of age and exhibited a mental decline, accelerated by his wife's death. Previous to making his will he had executed others, making almost an equal distribution among his sons. Testator and one of his sons had been in business, and in the former will the gift to such son was conditioned that he cancel a bond due him by testator. Three days before the last will was executed, testator signed a paper directing all unsettled accounts between him and such son, after his death, to be referred to arbitrators, waiving limitations. Testator's children, except such son, were not with him when the last will was executed, and under his direction it was concealed from them. By such will an equal distribution of the estate was made, but the portion of such son was to be in addition to the amount due him by testator.—*Held* sufficient, in view of testator's mental condition, to warrant the setting aside of such will for undue influence of such son.

On appeal from a decree of the orphans court of Cumberland county admitting to probate a will purporting to have been made by Steen Edwards.

*Mr. Robert S. Schiller, Mr. James J. Reeves* and *Mr. David J. Pancoast,* proctors for the appellants.

*Mr. James S. Ware,* proctor for the respondent.

REED, VICE-ORDINARY.

Steen Edwards died April 24th, 1900. On March 20th preceding his death the will in question was executed. By it he left his property to his eight children, all sons. Five of them filed a *caveat* in the surrogate's office and now prosecute this appeal.

The grounds of attack are mental incapacity of the testator and undue influence exerted upon him by his son Theodore E.

At the date of the making of the will the testator was a very old man—ninety years of age. For a period preceding his death, reaching back several months, he had exhibited a progressive mental decline. The death of his wife on the 26th of the preceding December had accelerated this deterioration. He was by habit and affection strongly attached to her, and her death worried and perplexed him, and increased his confusion of thought. The evidence is plenary that events and words made but a transient impression upon his brain. He failed to recognize his own children. He would ask the same question over and over again, after repeated answers. He thought his wife was still living. The testimony of his housekeeper and others not interested in the result of this litigation, shows beyond question that the general mental condition of the testator at the time he signed this will was one of great confusion of ideas, of inability to think consecutively and of forgetfulness of his surroundings. Even Theodore E. admits that after his wife's death the testator did not know where he was or what had happened. It is true that he filled up and signed checks as late as February 24th, but this seems to have been merely mechanical, for his son Valdemar says, and I have no doubt truly, that he dictated the written portions of those checks. Valdemar's testimony tallies with that of the collector for the gas company, who tells of the unsuccessful attempts of the testator, when unaided, to prepare a check for the amount of his gas bill. His family physician says that he was not capable of testamentary disposition after the death of his wife. His conversation with him was confined, it is true, to professional inquiries concerning his symptoms, but the testator's answers to those inquiries were calculated to impress the physician with a low opinion of the testator's mental condition. His testimony is that he was afflicted with the confusion and slowness and inability of thought which accompanies very old age, coupled with physical infirmities.

The two witnesses mainly relied upon by the respondent to show that the testator had testamentary capacity are Dr. Ware, who did not attend him as physician, but talked to him as an

acquaintance, and Mr. James S. Ware, who drew the will in question.

Dr. Ware says that the testator had some of the symptoms of *senile dementia*. He, however, details a conversation which he had with the testator, after the death of his wife, in which conversation he says that the testator was entirely rational. The conversation undoubtedly shows that the testator knew that his wife was dead; that he was depressed by her death, and that on account of her death he thought of making another will. The subjects discussed were, however, within very narrow limits, but upon these subjects he talked sensibly.

Mr. Ware, who drew the will, states that the testator described his property and gave him the names of his sons, and instructed him as to what he wished the will to contain. He is of the opinion that the testator was entirely competent to make a will. The impression of Mr. Ware as to the testator's capacity is quite different from that of Mr. Reeves, who had been for a long period the counsel for Mr. Edwards. Mr. Reeves says that Mr. Edwards was demented and incapable of any business transaction whatever. Both these gentlemen are proctors in the case, and while highly honorable practitioners, their testimony must be discounted by the unconscious influence of a desire for victory, which naturally shades the opinions of any witness who is at the same time of counsel in the cause.

Mr. Ware says that Mr. Edwards went into an elaborate description of the property he owned. There is, however, no description of his property contained in the will, nor, as the will was drawn, was such a description necessary. There is nothing to show that he named all the property that he owned, for it does not appear in the will, nor does Mr. Ware give the list of properties which he says the testator described, nor does he say that he knows that the list was correct. The testator did, undoubtedly, name his sons, for they are all mentioned in the will, and Mr. Ware says that he knew only two of them.

Of his eight sons only Theodore E. and Adolph afterwards lived at home. They worked in the florist business which had been organized by the father. Until 1883 Theodore E. worked for his father, and his father had recognized an indebtedness to

him by executing a bond to him for $1,283.   In 1883 Theodore
E. entered into partnership with his father in the florist business.
This partnership continued until 1895, when the father retired,
and his son Adolph took his place in the firm.   Theodore E. says,
that apart from living at home he had no remuneration up to
1891 beyond $875 he drew during that period; that he drew $5
a month after that date for one year, and thereafter $15 a week
until 1895.   In 1895, as already observed, the partnership be-
tween Theodore E. and his father was dissolved, and the business
was continued by Theodore E. and Adolph.   Disputes had arisen
between Theodore E. and his father in respect to the manage-
ment of the business, and a considerable degree of bad feeling
had been engendered in the mind of the father towards Theodore
E.   Theodore E. says that he had tried to get an account settled
between his father and himself concerning their partnership
transaction from 1883 to 1895, but had never succeeded.   The
father's dislike for Theodore E. and his preference for his other
children had been manifested in a variety of ways.   The present
will is not the first which the testator had made.   He made one
on December 16th, 1890, and by it he gave all his property to
his wife for life, and then directed that after her death his prop-
erty should be sold, and that all the proceeds should go, one-sixth
to Theodore E., Adolph, Leslie, Valdemar, each, and one-twelfth
to Julius, Odin, Devoux and Otto, each.   He expressed a wish
that Theodore E. and Adolph should purchase that part of the
farm upon which the florist business was carried on and continue
the said business.   The gift to Theodore was upon the condition
that he cancel the bond for $1,283, already mentioned.   He
named his wife, his sons Theodore E. and Odin and James J.
Reeves, his executors.

On October 15th, 1895, he made a codicil to this will, in which
he substituted Adolph in place of Theodore E. and Odin, as
executors.   He changed the portions which he gave to his several
sons.   He gave to Leslie, whom he says had not received as much
help from him as the others, two-ninths of his property, and to
each of the other sons one-ninth. He made some change in the
amount of property which he had directed his executors to sell.
He finally directed that whatever might be due to him, by any

of his children, either by judgment, book account or otherwise, should be deducted from their respective shares, and that if any of them should contest his will, such son should forfeit his share.

On June 9th, 1896, he made a memorandum of the amounts due from his sons. This memorandum was modified by another memorandum made on September 6th, 1897, and by still another made December 29th, 1897. On August 15th, 1899, he executed another codicil, drawn by Mr. Reeves, by which he gave Valdemar's share to Valdemar's wife. This change was made because Valdemar had creditors, and the codicil was executed, Mr. Reeves says, because it was understood that there would be no objection on the part of his sons to this disposition of the share of Valdemar, and not because he thought that the testator had then the capacity to make a will which would stand against an attack. With the exception of this codicil, the codicil of 1895 stood unchanged until the execution of the will in question.

On March 17th, 1900, three days before this will was signed, the testator signed another paper by which he directed that all unsettled accounts between himself and Theodore E. should, after testator's decease, be referred to arbitrators to determine the amount owing to Theodore E. by testator. This paper provides also that the amount shall not be lessened by reason of the bar of the statute of limitations, which bar was expressly waived. This paper was drawn from instructions given to him by Theodore E. by Mr. Ware, who afterwards drew the will. It was signed by Mr. Edwards at his home and witnessed by the same housekeeper who witnessed the will. At this time there was none of the children at home other than Theodore E. Valdemar and wife, who had been staying with Mr. Edwards, had gone to Atlantic City to remain a few days. Three days after the execution of this paper, Theodore E. telephoned for Mr. Ware to come to testator's house. Mr. Ware went to the house and there prepared the will which was executed in the presence of Theodore E. and the housekeeper, Valdemar and his wife being still absent. By direction of Theodore E., the execution of the will was concealed from Valdemar and the other children. Theodore E. admits that he told the housekeeper to be silent about it, and in reply

to the query why he did so, says that he did so because it was no one's business but his own. On further questioning he says that he knew that if she told anyone about it, that some of the rest of the boys would have Mr. Reeves out there the next minute they could get hold of him, and there would be trouble all round there. This explanation of Theodore E. is perhaps the strongest testimony in the case that the testator was in a low mental condition. Normally, he was a man of independent, indeed, of obstinate, opinions and set views. He had refused, according to Theodore E., to make any arrangement for the settlement of the accounts between Theodore E. and himself. At this time Theodore E. feared the effect of an interview between him and the other sons regarding the execution of the will. Besides, he discarded the lawyer whom the testator had always employed, and brought in a stranger. He thought that Mr. Reeves was not friendly to him because Mr. Reeves had told him, on the occasion of an interview between Theodore E., his father and himself, that he was trying to feather his own nest. It is entirely obvious that Theodore E. feared the effect of a consultation between Mr. Reeves and his father as well as the influence of the other sons in case they should be apprised of the execution of this will. Not only does this conduct of Theodore E. display his sense of the mental weakness of his father, but the fact that his father consented to the substitution of a stranger in place of his family counsel, displays that he was not sensible of his surroundings.

Then again, there is a feature in the will itself which, in my judgment, makes in the same direction. Mr. Ware says that at the time of the execution of the will the testator expressed a desire to leave the children just as nearly equal as possible. As the will was drawn, all his property was to be divided equally, the portion of Theodore E. to be in addition to the amount owing by the testator to him, provision for the ascertainment of which, in the language of the will, was made in another paper. There was not a word said about the debts of the children. As already observed, in the codicil of October 15th, 1895, he provides that the debts of the children should be deducted from

their respective shares. These debts, as set out in the memorandums executed of July 9th, 1896, September 6th, 1897, and December 29th, 1897, range from none against Julius and Leslie to $140 against Otto, $130 against Adolph, $1,740 against Theodore E., $1,931.62 against Devoux, and $5,140 against Odin. There is nothing to show that the amount of these debts had been changed since the execution of the last memorandum. The testator in 1895 had regarded, very properly, the charging of these debts against the share of each child, as a radical part of his scheme of testamentary division. In 1900 it was equally important, perhaps more so, in view of the small amount of the estate. Testator notes in his memorandum that for some of these claims there was no written evidence, and it is obvious that at the time of the execution of the last will, that most of them were uncollectible by reason of the bar of time.

I am convinced that the existence of these claims against his sons was not in his mind on March 20th, 1900. I think that while he had the power to recall the real estate around him, which was so familiar, he did not have the power to recall the terms of his previous codicil of 1895 nor the fact of the existence of the debts of his children. In my judgment this power was essential to a valid execution of the will.

In respect to Theodore E.'s connection with the execution of this will, he denies that he urged or even first suggested that his father should make a will. His account is, that upon the occasion when the will was signed, his father said that he wanted to make a will and that witness asked him several questions about it, and then testator asked him if he would get somebody to make a will; that witness said that Mr. Ware would be a good one to get, and testator replied, "Well, you can get him."

Theodore E. also says that he did not know what was in the will. If he means by this that he did not see the will and that he was not told by Mr. Ware what had been written in the will, I have no doubt his statement is true. Whether he had a previous knowledge of what was to be the contents of that will is another matter. He admits that he asked several questions about it of the testator before sending for Mr. Ware, but he does not

say upon what subject the questions were addressed to the testator. He had been officious in suggesting the paper signed by his father three days before, and had had it drawn and saw that it was signed. It is in the highest degree probable that in that conversation he not merely ascertained, but suggested the contents of the will, at least in so far as the will contained a recognition of the previous paper signed by the testator. It is urged, however, that it is proven that after his wife's death the testator had repeatedly expressed a wish to make a new will, and there is no doubt that he had so expressed himself. He had so told Dr. Davis who dissuaded him, and Mr. Reeves who told him it was unnecessary. He had become possessed with the notion that his wife's death made it necessary to make such a will. When told otherwise, he abandoned his intentions, then would forget and speak of it again. Besides, I have no doubt he was influenced by a vague fear that Theodore E. would make trouble. He had distrusted Theodore E. as tricky, and disliked him as overbearing. As he became weak and his power of resistance diminished, his fear of future trouble between the children took possession of his debilitated mind. This trouble he feared from Theodore E.'s masterful disposition, and his fear was augmented as his mental powers decreased. He was in a mood to do anything suggested by Theodore E., and in this mood he signed the paper of March 17th, for the first time recognizing Theodore E.'s claim against him, and provided that the amount should be ascertained after his own lips were closed by death, and without providing how the arbitrators should be chosen. In my judgment, even if the testator's mind was such that he could have made a will, if he had done so uninfluenced, yet the circumstances show that he never would have made this will unless influenced by Theodore E. to a degree which, in view of the testator's mental condition, was undue.