[1] Reported in 286 N.W. 306.
From an order admitting the will of Sander Osbon to probate, the contestants, decedent's niece and nephew, appealed to the district court for Nobles county. The appeal raised two questions: (1) Whether the decedent had sufficient mental capacity to legally execute a will; (2) whether it was the product of undue influence on the part of decedent's sister, Amy Johnson. The jury rendered a verdict favorable to proponents upon both questions. The district court denied contestants' motion to set aside the verdict and for a new trial. Thereafter judgment was entered, and from it contestants appeal.
1. A variety of asserted errors have been assigned. Several can be reduced to the contention that the verdict of the jury is unsupported by the evidence. A reading of the record compels the conclusion that there is no merit in this contention. The testimony at *Page 421 
the most raised fact issues. The jury, having the duty to determine credibility and to weigh the evidence, could very properly conclude as it did. A short summary of the evidence will conclusively establish this. The decedent, Sander Osbon, was a man of some financial means. On March 31, 1935, he died and left him surviving as his heirs at law the contestants herein, Harry Osbon and Agnes Groenwold, and a sister, Amy Johnson, one of the proponents. In 1934 Sander Osbon, who was then married, had Leo Hartfiel, the cashier of the First State Bank of Rushmore, draw a will in which one-third of his property went to his wife and two-thirds to his sister, Amy Johnson. In February, 1935, Osbon secured a divorce from his wife and shortly thereafter revoked the will of 1934 by physical destruction in the presence of Hartfiel. Hartfiel testified that at this time Osbon said "he would be back in a few days and make a new one." On March 15, pursuant to his doctor's orders, Osbon entered the hospital at Worthington. On Tuesday morning, March 26, 1935, Hartfiel visited Osbon at the hospital. He testified that after they had conversed for a while Osbon requested him to draw another will. Hartfiel testified that he told Osbon that he did not have paper with him and that he would get Arnold Brecht, an attorney who had previously done legal work for Osbon, to draw it. He testified further: "He told me to make it out to Emma [Amy] Johnson, his sister. He told me I should be executor of the will." Osbon said to him: "You go up and have Arnold [Brecht] draw it and bring Arnold along with you and we will fix it up."
The will was drawn immediately, and Hartfiel and Brecht returned to the hospital about eleven o'clock a. m. The will was then executed in the hospital with Brecht and the head nurse, Miss Mamie Odden, as witnesses. Hartfiel testified that Osbon stated that the will was just the way he wanted it. While Osbon was placing his signature he paused and said, "You better get my glasses, they are lying on the desk." Both Brecht and Hartfiel testified that they had known decedent a long period of time and that from their conversations with him at the time the will was executed it was their opinion that Osbon was of sound and disposing mind. The remaining witness to the will was Miss Odden, who *Page 422 
testified that during the time Osbon was in the hospital she conversed with him from time to time and frequently observed him reading the paper, especially the market section. Her testimony was to the effect that at the time Osbon signed the will he was "very bright." It was likewise her opinion that at this time Osbon was of sound mind. Another nurse at the hospital, Miss Alice Thornton, while not a witness to the will, cared for and observed Osbon while he was in the hospital. She testified that Osbon appeared to be normal and much the same from the time he entered until the 27th, when he took a turn for the worse and a special nurse went on duty. She likewise thought Osbon was of average normal mental condition on the morning of the 26th and that the change in condition "came as quite a surprise to everyone."
Against the evidence procured from these witnesses, whom the jury obviously could and apparently did believe, was testimony that Sander Osbon often consulted a fortuneteller. Mrs. Lena Osbon, wife of decedent's brother and mother of contestants, testified that on the 25th she visited the hospital. She was asked: "Did you talk to Sander that day? A. Well, I did and he was just drowsy, just mumbling. I could not understand what he said. * * * Q. Did he look at you? A. He did and threshed around like he was sleepy, throwed his arms like that (indicating)." Other witnesses testified in a similar manner for contestants. Still others stated that they had come to the hospital and were denied admittance on the ground that only relatives could see Sander Osbon. Harry Osbon, a contestant, testified that on March 25 he went to see Sander and when asked to describe his condition at that time stated: "His eyes were rolling, if I remember right and tossed himself around the bed." Bert Groenwold, husband of one of the contestants, testified that he saw Sander on the morning of the 26th and at that time Sander "was lying there and sometimes he kind of waked up for a minute or two or said something, he said a word or so and just dozed off and mumbled." Mrs. Idella Butcher, a nurse at the hospital, testified that Osbon did not always speak so that he could be understood and that on the 25th his doctor asked *Page 423 
that only relatives see him. She also testified that around the time the will was executed Osbon became more restless.
There does not seem to be much doubt that Osbon was suffering intense pain on various occasions and that sedatives and stimulants were administered to him. The hospital records show that on the morning of March 26 about eight o'clock, some three hours before the will was executed, Osbon was given phenobarbital, and the nurse noted the patient was "very drowsy."
It seems obvious from the testimony that a fact issue was presented. The finding of the jury that Osbon was of sufficient mental capacity at the time the will was executed is amply substantiated by evidence which they could properly determine was credible. We are not free to set aside the finding below, and it must stand.
2. On the question of undue influence the record has been searched for any substantial evidence. The jury determined that there had been no undue influence by Amy Johnson. Again it is urged that the finding is contrary to the evidence.
Contestants' witnesses testified that while Osbon was in the Worthington hospital his sister, Amy Johnson, was present in his room for a substantial portion of the determinative time. Much testimony was produced to show that she decided who should be admitted to the room to visit Osbon. A witness testified that Amy Johnson told him that before the will was ever executed she knew she was going to be given all the property although for a while she had feared the contestants might receive some. Other evidence was adduced in an effort to prove that decedent's sister had considerable influence over him and that ample opportunity existed for the exercise of it, especially in view of her presence at the hospital and decedent's sick condition. Reliance is also reposed on the fact that all of the property was given Amy by the second will, and that various stimulants and sedatives were administered to Osbon, thereby making him more susceptible. Against this appears proponents' testimony that contestants in the case at bar were proponents of the will of Osbon's father. Both decedent and his sister were the contestants in that case, and a serious contest ensued. From the evidence the jury could find that, while Osbon may at one time have *Page 424 
pledged himself to support the contestants, yet since the will contest the relations were not too friendly. Neither of the contestants was ever in a new home Osbon built in 1929. Agnes Groenwold last saw Osbon in 1933 except for a few casual meetings in 1934. The will of 1934 gave two-thirds of the property to Amy Johnson, and the second will merely added to her gift the amount previously given to the wife of Osbon, upon whom a property settlement was made when they were divorced. The jury could properly find on this evidence that Osbon executed the will with the provisions giving all his property to proponent as his free and voluntary act. The finding, being supported by sufficient credible evidence, will be allowed to stand.
3. Other alleged errors have been assigned. The claim is advanced that there was error in the refusal to allow contestants to recall witness Charles B. Andrews. Andrews had testified on direct examination that after Osbon's death he and Amy Johnson talked over some business affairs. He stated that during their conversation she told him that she and Sander had talked over the latter's property affairs. He testified that sometime in May he again talked with her. He stated that at this time she said, "Mr. Andrews, I never talked to Sander anything about his property before he made his will." After cross-examination the witness stepped from the stand and conferred with one of the contestants' attorneys. He was shown a paper on which the attorney had written certain words. The court was informed that the contestants wished to recall Andrews to answer questions based entirely upon the writing. When this was refused an offer of proof was made to show by Andrews that Amy Johnson had also said to him that "I kept talking to him [Sander Osbon] until I knew before he made his will I would get all of it." The court rejected it "for the express reason that the witness is now asked to state something exhibited to him by contestants' counsel which was written on a piece of paper prepared by counsel, and he having already testified he had fully related the conversation."
The court in its discretion had the power to refuse the request of the contestants. Once a witness has been dismissed, recall is not *Page 425 
of right but is permissible in the exercise of the sound discretion of the court. 6 Dunnell, Minn. Dig. (2 ed. 1937 Supp.) § 10321. While in many instances it might well be an abuse of discretion to preclude a party from showing a necessary and vital part of his case, yet in each instance the surrounding circumstances under which the witness is sought to be recalled are vital. Here there was no guaranty that Andrews would testify as to facts within his own knowledge. He had testified that he had fully related the conversation. The offer of proof would of necessity be in contradiction of this. The trial court, in view of the circumstances, did not exceed the limits of the discretionary power vested in it. It would scarcely have been justified in ruling otherwise.
4. Likewise there was no error in the refusal to permit the divorced wife of the decedent to testify as to conversations between the two during marriage. 2 Mason Minn. St. 1927, § 9814(1), operates as an absolute bar. The statute provides that neither the husband nor wife during marriage or afterwards without the consent of the other spouse can be examined as to any communication made by one to the other during marriage. It is immaterial that Osbon is dead. Newstrom v. St. Paul Duluth R. Co. 61 Minn. 78, 63 N.W. 253.
5. Error is again assigned on the ground that the court permitted the proponents to introduce in evidence the contents of the 1934 revoked will. By settled law it was admissible. The charge of undue influence was asserted by contestants. The prior will gave Amy Johnson two-thirds of the property. The present instrument bestows all of it upon her. The evidence presented went directly to the point raised by the contestants. The theory upon which the evidence is received is accurately stated in In re Estate of Stump, 202 Cal. 308, 310, 260 P. 543,544. "The trial court very properly admitted the contents of the former will of the testatrix as tending to show a permanent and fixed state of mind with regard to her plan for the disposition and administration of her estate." Again, "if they [prior wills] are consistent with provisions of the later will, they may tend to rebut the charge of undue influence." In re *Page 426 
Will of Hermann, 87 Misc. 476, 489, 150 N.Y. S. 118, 128. See, generally, 68 C. J. p. 773, § 462.
6. The contention is made that the trial court coerced the jury into a verdict. The court called in the jury at 11:40 p. m. to instruct them as to a sealed verdict. They were told that when they reached a verdict they could separate for the night after complying with the court's detailed instructions, and were to appear at 9:30 a. m. the following morning to hear the verdict read. A juror asked: "Suppose we don't come to a verdict at 9:30 tomorrow? The Court: You will still be there. You understand, Mr. Wiegel, at the close of 12 hours of deliberation it is then possible to reach a five-sixths verdict." The jury did not return a verdict until 2:15 p. m. the following day. Contestants rely upon Mar v. Shew Fan Qui,108 Minn. 441, 442, 122 N.W. 321, 322, 133 A.S.R. 460, wherein it was held to be coercion for the trial court to tell the jury: "I do not feel that I can let you go until you return a verdict."
Under the circumstances we do not think there was coercion. The statement of the court is somewhat ambiguous standing alone. It was very likely intended and understood to mean that the jury might continue its deliberations beyond 9:30 a. m. if necessary rather than that they must. It is not likely that the jury regarded the court's statement as a threat to keep them confined in an uncomfortable jury room. The jury in fact deliberated a considerable length of time after 9:30 a. m. It seems obvious that the case was determined by them on the merits as contrasted with the conduct of the jury in Mar v. Shew Fan Qui, supra. Certainly there was no prejudice to contestants.
Other contentions asserted in the brief have been considered but do not merit discussion.
Since the submission of this case it appears that Amy Johnson died on May 27, 1939, and her special administrator has been substituted for her as proponent-respondent by order of this court.
The judgment appealed from is affirmed.
Affirmed.
MR. JUSTICE HILTON, being incapacitated by illness, took no part. *Page 427