[1] Reported in 35 N.W.2d 439.
In this case the trial court held that the will offered for probate was invalid upon the grounds that testator lacked testamentary capacity and that the will was procured by means of undue influence exerted upon testator by Henrietta May Mork, who is named therein as chief beneficiary and as executrix. She was the proponent of the will and is appellant here, together with John A. Anderson, administrator with the will annexed.
The appeal presents four questions for decision: (1) Whether the evidence sustains a finding of lack of testamentary capacity; (2) whether it sustains a finding of undue influence; (3) whether cross-examination of the beneficiary-proponent, who received under the will the bulk of testator's estate, was permissible to show extra-judicial declarations by her that she had testator change his will, for the reason that a prior will gave other beneficiaries more than it gave her; and (4) whether testimony showing such declarations constituted substantive proof of the facts to which they related.
The will was executed on March 16, 1945. Testator was then almost 90 years old. About ten days prior to the execution of the will he fell downstairs into the basement of Henrietta's house, where he lived, and sustained injuries which necessitated keeping him in bed and the services of a physician for their treatment. The evidence showed that for at least several months prior to the execution of the will and afterward testator suffered from senile dementia caused by general arteriosclerosis. While he was confined to his bed as a result of the injuries caused by the fall, his mental condition was such that he did not realize that the physician who cared for him was in fact such.
Testator's estate was of the value of approximately $17,500. About a year prior to his death he conveyed by deed to Henrietta a farm he owned near Ellsworth, Wisconsin, to which further reference will be made. Testator was a childless widower. So far as appears, his only relatives were those named in the will, which provided for bequests of $1,000 to his brother Ole, $500 to his nephew Ray Olson, $1,000 to Arnold Olson, $100 to his church, and the residue (almost *Page 292 
$15,000) to Henrietta. Ray Olson is the son of testator's deceased brother, Tollif. Arnold Olson and Henrietta are brother and sister. They are grandchildren of testator's deceased wife, but are not blood relatives of testator. Henrietta was reared from the time she was two and one-half years old by testator and his wife in their home and treated as their child. Testator and Henrietta had a deep and genuine affection for each other, which was manifested by his calling her "granddaughter" and by her calling him "grandpa," and by acts of service, kindness, and thoughtfulness for each other. Arnold Olson lived with testator and his wife in their home from the time he was five years old until he became 15 1/2 years of age and, like Henrietta, was treated as their own child. The witness Arthur Ludwig, who is not a blood relative of testator or of any of the others mentioned, lived with testator and his wife from the time he was eight years old until he became 20 years of age. Testator and Ludwig had a strong affection for each other, and at the former's suggestion they referred to each other as though they were father and son. Except for lucid intervals, during one of which it was claimed the will in question was executed, testator was mentally incompetent.
From 1935 to 1937, testator and his wife lived with Henrietta and her husband, Lars Mork, in their home on the farm owned by testator in Wisconsin. After testator's wife died in 1939, he lived with Henrietta and her husband on the farm. For at least a year prior to the execution of the will, a confidential relation existed between testator and Henrietta. He had told others that she was looking after his business affairs. While Henrietta testified categorically that testator transacted his business himself, there was evidence showing that for at least a year prior to his death she either attended to his business or assisted him in doing so. The trial court made findings, unchallenged here, that because of testator's disabilities Henrietta "had to do his business for him" and that "a confidential relationship" existed between them (the latter as a conclusion).
It appears from the testimony of Ludwig that prior to the execution of the will testator intended to make both intervivos and testamentary dispositions of his property. This he intended to do by a *Page 293 
conveyance of the farm to Henrietta and by a will providing for a division of the residue. It was not shown among whom he intended to divide the residue or in what proportions. The farm, consisting of about 120 acres of land, on which there were a house and other buildings, was referred to on the argument as "valuable," but its value was not shown. Testator told Ludwig that he would take care of him when the proper time came, but there is nothing to show whether such provision was to be made by will or otherwise.
Testator executed his intention, except as to providing for Ludwig, to so dispose of his property. On April 27, 1944, less than a year before he executed the will, he conveyed the farm to Henrietta by warranty deed, reserving a life estate and providing that part of the consideration for the grant was that she should during his life furnish him with a suitable home in a manner to which he had been accustomed, and should provide him with his meals and laundry, but that she should not be liable for funeral expenses, medical bills, nursing, or any necessary hospitalization. The deed was recorded. Henrietta's obligations under the deed to care for testator were discharged by making ample provision for him and treating him kindly. For this he was appreciative and so expressed himself many times. Testator also executed a will (that is, a will prior to the instant one), as he expressed an intention to do, disposing of the residue of his estate. The terms thereof were not shown. Presumably, it disposed of testator's property other than the farm conveyed to Henrietta. It does not appear whether testator made provision therein for Ludwig; but, as has been pointed out, testator had not affirmatively manifested an intention to provide for him in his will rather than in some mannerinter vivos.
On the morning of March 16, 1945 (ten days after testator fell down into the basement), according to Henrietta's testimony, testator expressed a desire to have a will drawn. She testified that at his suggestion she wrote on a sheet of paper the names of the proposed beneficiaries and the amounts he intended to give them "so it would be handy for him when he gets to the [attorney's] office"; that she and her husband took him to Red Wing to have testator's lawyer *Page 294 
draft the will; and that, after she first ascertained that the attorney was in his office, she took testator there for the purpose of having his will drafted. She had with her the paper with the names of the beneficiaries and the amounts to be given them. Testator stated to the lawyer: "Well, we have, we have fixed up a little paper." (Italics supplied.) Thereupon, Henrietta handed the paper to the lawyer, and at his suggestion she left the room. The lawyer testified that in answer to his inquiry of testator whether "he knew how the things were to go or words to that effect," he answered: "Yes, I have some idea.That paper has something on it." (Italics supplied.) The paper, which has since been mislaid or lost, was placed by the lawyer on his desk, where the names and amounts thereon were visible. He then interviewed testator to elicit from him his wishes with respect to the disposition of his property. While the lawyer testified that he did this without the aid of the paper, the evidence permitted the inference that testator could see the paper. The lawyer's testimony shows that testator had in mind a definite plan for the disposition of his property by the will and that he had a correction made in the final draft of the will to express such intention. By his will, he gave his property to those whose names were on the paper, but it does not appear that he gave them the amounts therein specified. The lawyer and his partner were witnesses to the due execution of the will. Both of them testified as to the facts surrounding the execution of the will and to facts showing that at the time of executing the will testator had testamentary capacity. It appears from their testimony without contradiction that testator was in the lawyer's office during one of his lucid intervals; that he then comprehended the nature and extent of his property, his relation to those naturally having claims on his bounty, and the effect of the will which he then executed; and that he was able to hold all these things in mind and form a rational judgment concerning them. The lawyer was not informed of testator's fall downstairs into the basement ten days before the date of the will. There was no evidence that he had been informed of the confidential relation between testator and Henrietta, of testator's previously expressed intentions *Page 295 
as to the disposition of his property except the prior will, or of testator's conveyance of the farm to Henrietta.
At the trial, contestant was permitted to cross-examine Henrietta, who as proponent of the will had been called as a witness by her own attorney, to show that about the time of filing the petition to prove the will Arnold asked her: "Why did you have grandpa change his will?" and that she replied: "Because you fellows would have stood to gain more than I would." At first she testified that she did not remember any such conversation. Afterward, under examination and some leading by her own counsel, she changed her testimony by stating that the conversation referred to a document Arnold wanted her to sign and not to the change in the disposition of testator's property by the will in question. This explanation was characterized by the trial judge as "not entirely satisfactory." In addition to permitting such cross-examination, contestant was permitted to impeach Henrietta by Arnold's testimony that in response to the question he put to her, "Why did you have grandpa change his will?" she answered, "Because you fellows would have stood to get more than I would," or words to that effect. The trial judge in deciding the case treated the declarations of Henrietta to Arnold as substantive proof of the fact that she not only had testator execute the will in question to take the place of the prior one, but also that she did so because the other beneficiaries would have received more under the prior will than she would have.
1. Findings of fact and conclusions not assigned as error on appeal are deemed to be correct. Raymond v. McKenzie, 220 Minn. 234,19 N.W.2d 423. It follows that the unchallenged findings that Henrietta attended to testator's business and that a confidential relation existed between them must under the rule be deemed to be correct here.
2. Where the evidence as to testamentary capacity and undue influence is conflicting, findings of the trial court with respect to such questions are final on appeal, even though the appellate court, if it had the power to try the questionsde novo, might determine otherwise upon reading of the record. In re Estate of Forsythe, *Page 296 221 Minn. 303, 22 N.W.2d 19, 167 A.L.R. 1; In re Estate of Christ, 166 Minn. 374, 208 N.W. 22; Church of St. Vincent de Paul v. Brannan, 97 Minn. 349, 107 N.W. 141. See, Lappinen v. Union Ore Co. 224 Minn. 395, 29 N.W.2d 8.
3. The evidence as to testator's testamentary capacity at the time of the execution of the will is all to the effect that he had such capacity. There was no conflict therein to be resolved by the trier of fact, and consequently the finding made with respect to the question is not final here under the rule stated. A will made by a person otherwise lacking testamentary capacity during a lucid interval, when he possessed such capacity, is valid. The test is whether the testator had mental capacity at the actual time of making the will. In re Estate of Boese, 213 Minn. 440, 7 N.W.2d 355; In re Estate of Holmstrom, 208 Minn. 19, 292 N.W. 622; 6 Dunnell, Dig. Supp. § 10208, and cases cited in note 53. Testamentary capacity means that the testator at the time of making his will comprehended his relation to those who naturally have claims on his bounty, the extent and situation of his property, and the effect of the will disposing of it, and that he was able to hold these things in mind long enough to form a rational judgment concerning them. In re Estate of Luke, 220 Minn. 104,19 N.W.2d 5; Schleiderer v. Gergen, 129 Minn. 248,152 N.W. 541. The evidence here conclusively shows that testator executed the will during a lucid interval and that at that time he possessed mental capacity in all particulars required by the rule. Hence, the finding of lack of testamentary capacity must be set aside.
4. Whether the will was procured by undue influence exerted by Henrietta presents a different question. The will of a testator possessing testamentary capacity may be the result of undue influence, even where he has had the independent advice of counsel in drafting it, as we shall show presently. Edwards v. Edwards, 63 N.J. Eq. 224, 49 A. 819. See, 57 Am. Jur., Wills, § 356.
Under well-settled rules, the finding of undue influence here should be sustained. There was evidence showing as independent facts both undue influence and its effect upon testator's mind. *Page 297 
While opportunity to exercise undue influence or the existence of a confidential relation between testator and a beneficiary are not, standing alone, proof of undue influence, yet when such opportunity arises out of a confidential relation and there are bequests to one sustaining the confidential relation and also active participation on his part in the preparation of the will, disinheritance of relatives, singularity of the provisions of the will, and acts of evasion on the part of the beneficiary sustaining the confidential relation, an inference of undue influence is permissible. In re Estate of Olson,176 Minn. 360, 223 N.W. 677; In re Estate of Jernberg, 153 Minn. 458,190 N.W. 990. See, In re Estate of Wilson, 223 Minn. 409,27 N.W.2d 429. Here, the evidence shows the existence of every fact requisite under the rule to justify such an inference. Testator's age, his feeble and senile condition, and his residence in Henrietta's home showed that he was susceptible to undue influence and that abundant opportunity was afforded for Henrietta to exert it. Fischer v. Sperl,94 Minn. 421, 103 N.W. 502. In such a situation, an "inference of undue influence is said to arise where [as here] testator is aged and feeble, leaves the bulk of his property to the children [here Henrietta] with whom he lives to the exclusion of others for whom he has always manifested affection, or where [as here] testator actually reposes trust and confidence in the person with whom he lives." 2 Page, Wills (Lifetime ed.) § 825.
The prior declarations of testator as to how he intended to dispose of his property reveal a fixed purpose with respect to the matter and, although disconnected from the making of the will, show the effect which the influence thus otherwise shown had upon his mind. In re Estate of Osbon, 205 Minn. 419,286 N.W. 306; In re Will of Storer, 28 Minn. 9, 8 N.W. 827; 57 Am.Jur., Wills, § 415. Of course a person has the right to change his mind with respect to the disposition of his property, whether it be by will or otherwise, but a change such as occurred here calls for the fullest explanation and justification. As said in Swenarton v. Hancock, 9 Abb. New Cas. 326, 362 (affirming 22 Hun 38, and affirmed in 84 N.Y. 653): *Page 298 
"* * * Every testator has, of course, the right to change radically, and even arbitrarily, the manner of disposing of his property; and, in the absence of fraud or imposition, courts will sustain his action in this respect. But when it has been found that an unnatural change has been made in a sick man's will, and one apparently contrary to his previous fixed and determined purpose, it is the duty of the courts to scrutinize closely the circumstances, with a view of ascertaining whether the act was free, voluntary and intelligent, or whether it was a substitution of the volition and interest of another, who by some irresistible influence secured the change."
And as said in Demmert v. Schnell, 4 Redf. Surr. (N.Y.) 409, 413:
"The rule to be deduced from the decisions on the subject is this: that where a person enfeebled by old age or illness makes a will in favor of another person upon whom he is dependent, and that will is at variance with a former will made, or intentions formed when his faculties were in their full vigor, and is opposed to the dictates of nature and justice, the presumption is that such a will is the result of undue influence, unless that presumption is satisfactorily rebutted by other evidence in the case."
An entire change from former testamentary intentions is a strong circumstance to support a charge of undue influence. Newman v. Smith, 77 Fla. 667, 82 So. 236. This is especially true where the effect of the change is to give the beneficiary charged with exercising undue influence a "larger" share of testator's estate than he would have received otherwise. Chamberlain v. Gordon, 129 Minn. 523, 151 N.W. 529. The facts here call for the application of the rule with its full vigor. The evidence shows not only that when testator was in full vigor and free from any influence he had definitely determined how he would dispose of his property — he intended to give the farm to Henrietta and to divide the residue — and that he had carried this intention into effect by executing the deed conveying the farm to Henrietta and by making the prior will. The deed to Henrietta, which was executed less than a year prior to the will *Page 299 
in question, shows that testator calculated and determined the extent of her claims upon his bounty, which was that she should have the farm subject to his life estate and her obligations to provide him a home and support; that she was to have no more than that; and that at the time of the execution thereof Henrietta acquiesced in testator's views with respect to the matter. See, Annotation, 82 A.L.R. 973. Aside from influence exerted on testator to change his will, no reason for the change was shown. When Henrietta was examined touching the reasons therefor, her answers were not only evasive, but in large measure lent credence to Arnold's testimony that she had made statements out of court to the effect that she had testator change his will because the others would have got more under the prior will than she. The change gave her the bulk of testator's estate contrary to testator's prior expressions of testamentary intention. In re Estate of Marsden, 217 Minn. 1,13 N.W.2d 765, cited by proponents, and similar cases, are not in point, for the reason, among others, that none of them involved, as does the instant case, a bequest to a beneficiary standing in a confidential relation to the testator and actively participating in the preparation of the will.
5. Proponent Henrietta urges that the fact that the lawyer who drew the will and his partner, who with him witnessed it, testified to no facts showing undue influence is sufficient to overcome any inference thereof that might otherwise be drawn. The facts that a lawyer drew the will and that the witnesses to the will observed no undue influence are to be considered as part of the entire fact situation in determining whether there was undue influence, but alone they do not establish the absence thereof. In numerous such cases undue influence was held to have been established. In re Estate of Stephens,207 Minn. 597, 293 N.W. 90; Phipps v. Van Kleeck, 22 Hun (N.Y.) 541; Matter of Spratt, 11 Misc. 218, 32 N.Y. S. 1092 (reversed on other grounds, 4 App. Div. 1, 38 N.Y. S. 329); Chambers v. Chambers, 61 App. Div. 299, 70 N.Y. S. 483; In re Will of Liney, 34 N.Y. St. 700, 13 N.Y. S. 551; Lee v. Dill, 11 Abb. Pr. (N.Y.) 214; Edwards v. Edwards, 63 N.J. Eq. 224, *Page 300 49 A. 819, supra; 2 Page, Wills (Lifetime ed.) § 830, note 9. As said in In re Will of Liney, supra (34 N.Y. St. 700, 13 N Y S. 551):
"Such fraud or undue influence is not usually open and visible to the draughtsman of the will, or to the attesting witnesses, but is commonly exercised behind the scene."
In the Chambers case, the court pointed out that the fact that the attorney who drew the will and the subscribing witness testified that the testator understood and assented to the will was no answer to the charge of undue influence, for the reason that the execution of the will was, as there said (61 App. Div. 310,70 N.Y. S. 490), quoting from Tyler v. Gardiner, 35 N.Y. 559,595, "the precise purpose, which the undue influence was employed to accomplish." (Italics supplied.) It is clear here that neither the lawyer who drew the will nor his partner, who was a witness thereto with him, was familiar with the facts from which an inference of undue influence was permissible, and that neither of them had reason to suspect the existence thereof. But it is also clear that testator regarded the paper written by Henrietta as embodying what he wanted the will to provide, as is shown by his answer to his lawyer's inquiry at the time of making the will as to whether he knew how he wanted to dispose of his property, that he had "some idea" and that "That paper has something on it." Thereby it was shown that testator had formed his testamentary intentions before he ever arrived at the lawyer's office; that the paper written by Henrietta embodied those intentions; and that he intended to embody them in the will then to be drafted. The evidence shows that the persons named in the paper were the beneficiaries under the will, and at least to that extent it affirmatively shows that testator's intentions thus formed prior to his arrival at the lawyer's office were embodied in his will. The facts that testator could have seen the figures on the paper and that there was no claim that those stated in the will differed from those on the paper lend credence to the belief that testator stated to his lawyer what by the exercise of influence upon him by Henrietta *Page 301 
before he arrived at the lawyer's office he had been prepared to say after he arrived there.
6. Declarations or admissions of one of two or more legatees or devisees are not binding on the others (Benrud v. Anderson,144 Minn. 111, 174 N.W. 617; McAllister v. Rowland, 124 Minn. 27,144 N.W. 412, Ann. Cas. 1915B, 1006), and are admissible solely for the purpose of impeaching the legatee or devisee making them, if called as a witness (Ormsby v. Webb,134 U.S. 47, 10 S.Ct. 478, 33 L. ed. 805). See, In re Estate of Forsythe, 221 Minn. 303, 22 N.W.2d 19, 167 A.L.R. 1. The rule is different in such cases from what it is where the declarant is a party upon whom the admission or declaration is binding. In such cases, the admission or declaration is substantive proof against the party of the facts to which it relates. Williams v. Jayne, 210 Minn. 594, 299 N.W. 853.
7. Arnold's testimony showing Henrietta's extrajudicial statements to the effect that she had testator change his will because the others would have got more thereunder than she is no proof of the fact that she had him change the will for the reason stated. The testimony simply shows what she said, not what the fact was. Impeachment testimony consisting of prior statements of the witness out of court is not substantive proof of facts stated therein, but is purely negative for the purpose of impairing the credibility of the witness. Klingman v. Loew's Inc. 209 Minn. 449, 296 N.W. 528; Pullen v. C. M. St. P. P. R. Co. 178 Minn. 347, 227 N.W. 352. That being true, it was not error for the trial court to receive in evidence Henrietta's declarations to the effect that she had testator change his will and the reason for doing so; but such testimony was to be considered solely as impeachment of Henrietta, and it was error in deciding the case to consider those statements as substantive proof of the facts therein stated. The error was prejudicial, because the inference of undue influence was a permissible one and not one compelled by the evidence; because the issue should have been determined solely by considering evidence relevant for the purpose; and because considering the impeachment as substantive proof *Page 302 
may have been the decisive factor in deciding the question to be decided.
8. The record shows that the parties have explored the factual situation exhaustively and that there is no likelihood of a new trial developing additional evidence. In such a situation, an entire new trial is neither necessary nor advisable. Where in a case tried by the court without a jury the trial court errs as to the rule of law to be applied in considering the evidence in making its findings, the appellate court should vacate the findings made and remand the case with directions to reconsider the entire record and make new findings in the light of the applicable rule of law. Prairie Farmer Pub. Co. v. Indiana F. G. Pub. Co. 299 U.S. 156,57 S. Ct. 135, 81 L. ed. 93. This is especially true where, as here, an appeal is in the nature of a writ of error. See, Lappinen v. Union Ore Co. 224 Minn. 395, 29 N.W.2d 8; Bostwick v. Mutual L. Ins. Co. 116 Wis. 392, 89 N.W. 538, 92 N.W. 246,67 L.R.A. 705; 3 Am. Jur., Appeal and Error, §§ 1215, 1155. The fact-finding function in such cases is in the trial court. In a case such as this, where the weight of the evidence depends in large measure upon the appearance and interest of the witnesses, the trial court is peculiarly qualified to discharge the fact-finding function, and the appellate court is not.
Our conclusion is that the decision below should be reversed with directions to the trial court to reconsider the question of undue influence in accordance with the rules stated in the opinion.
Reversed and remanded for reconsideration of question of undue influence in accordance with the opinion. *Page 303