*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0770**

In re the Estate of Harry L. Housker, Decedent

**Filed December 28, 2015
Affirmed
Smith, Judge**

Fillmore County District Court
File No. 23-PR-13-813

Barton L. Seebach, Story & Schoeberl Law Firm, LLP, Canton, Minnesota (for Ingvalson Donald Ingvalson)

Dwight Luhmann, Luhmann Law, LLC, Preston, Minnesota (for respondent Beverly Housker)

Gregory M. Schieber, Nethercut Law Office, Harmony, Minnesota (for respondent Donald Housker)

Considered and decided by Kirk, Presiding Judge; Worke, Judge; and Smith, Judge.

**U N P U B L I S H E D   O P I N I O N**

**SMITH**, Judge

We affirm the district court's order denying appellant Donald Ingvalson's petition to probate a 2007 will executed by the decedent because the district court did not clearly err in finding that Ingvalson had not met his burden of establishing that the decedent lacked testamentary capacity when he executed a 2010 will.

# FACTS

Ingvalson is the nephew of decedent Harry Housker (Harry). Respondent Beverly Housker (Beverly) is Harry's daughter-in-law. This dispute centers around the distribution of a one-quarter share of the residue of Harry's estate. In an April 9, 2007 will (the 2007 will) executed by Harry, Ingvalson and his sister are the named beneficiaries of this share. In a May 26, 2010 will (the 2010 will) executed by Harry, Beverly is the named beneficiary of this share.

Harry's only child, Dean, was killed in an automobile accident in 1998. Dean was survived by his spouse, Beverly. Harry's wife also died in 1998, shortly after Dean. Beverly testified that following the deaths, she and Harry were both "lonesome" and saw each other approximately once a week "to talk and cry together."

After his wife died, Harry lived alone. Family members testified that he became bored, lonely, and depressed, leading him to fall victim to mail and telephone solicitations. In 2002, a conservatorship action was commenced to protect Harry's assets. Catholic Charities was initially appointed as conservator, but in 2004, upon Harry's request, Harry's nephews, respondent Donald Housker (Donald) and Robert Housker (Robert), were appointed as co-conservators.

On April 9, 2007, Donald and Robert took Harry to meet with Harry's long-time attorney, Joseph Hammell. At the meeting, Harry signed the 2007 will. The 2007 will divided the residue of Harry's estate into four shares: (1) one share to Donald; (2) one share to Robert and his sister; (3) one share to the heirs of Harry's deceased sister; and

(4) one share to Ingvalson and his sister. The 2007 will did not name Beverly as a beneficiary.

In April 2008, Harry was diagnosed with dementia. Ingvalson's expert witness, who had never met Harry but had reviewed his medical records, testified that, based on the results of an exam that another doctor, Dr. Sarah Wymer, conducted in 2008, Harry had "mild to moderate dementia." Dr. Wymer testified at her deposition, the transcript of which was admitted into evidence at trial, that in 2009, Harry had "significant dementia that would impact his decision-making at home." Harry's family members testified regarding the changes to Harry's abilities between 2007 and 2010. Although most of them testified that his cognitive abilities had decreased during this time period, they all testified that Harry lived alone and was able to take care of himself with some assistance from family.

In early 2010, Harry called Hammell, stating that he wanted to review his will. Hammell suggested that Harry have Donald bring him into his office, but Harry rejected that idea and asked if Hammell would come to his residence instead. In approximately early April, Hammell met with Harry at Harry's residence. During this meeting, Harry expressed concern that Beverly was not included as a beneficiary in the 2007 will. After Hammell presented Harry with different options of how he could add Beverly to the will, Harry decided to replace Ingvalson and his sister with Beverly. His reason for doing so was that he hadn't seen Ingvalson and his sister in a long time and that Beverly was "helping" him. Hammell asked Harry if he should consult with Donald before making

3

any changes and Harry responded that he did not want to include Donald because Donald would not like what Harry wanted to do.

Approximately two weeks later, Hammell returned to Harry's residence. Hammell and Harry again discussed the addition of Beverly to the 2007 will. Harry reiterated that he wanted to replace Ingvalson and his sister with Beverly. One month later, on May 26, 2010, Hammell and two of his office staff returned to Harry's residence with the new will. Hammell and Harry reviewed every paragraph of the new will together, and Harry signed the 2010 will.

The office staff testified that when they were with Harry there was nothing out of the ordinary that led them to question his testamentary capacity. Further, they testified that he was dressed appropriately and that he engaged in small talk with them. Hammell testified that he spent "quite a while" with Harry on each of the three occasions they met. He testified that in addition to discussing the changes to the will, he and Harry discussed other things, like the weather, cattle, and cattle prices. Hammell believed that Harry had the requisite testamentary capacity when he executed the will.

Harry died on October 31, 2013. In November 2013, Donald, as the personal representative of Harry's estate, petitioned to admit the 2010 will for informal probate. Ingvalson subsequently filed a petition for formal probate of the 2007 will.[1] Beverly then filed an objection to the probate of the 2007 will. Following a court trial, the district

---

[1] Donald later motioned the district court to amend his original petition seeking to probate the 2007 will, rather than the 2010 will. When the motion was denied, Donald joined Ingvalson in support of the 2007 will.

court denied Ingvalson's motion to probate the 2007 will and ordered the probate of the 2010 will.

## D E C I S I O N

Ingvalson contests the district court's order denying his petition to probate the 2007 will and ordering the 2010 will to probate. Specifically, Ingvalson argues that the district court erred in finding that he had not met his burden of establishing that Harry lacked testamentary capacity when he executed the 2010 will.

The district court's determination of testamentary capacity is a finding of fact subject to reversal by this court only if clearly erroneous. *See In re Estate of Torgersen*, 711 N.W.2d 545, 550 (Minn. App. 2006), *review denied* (Minn. June 20, 2006); *see also* Minn. R. Civ. P. 52.01. Findings are clearly erroneous "only if the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Estate of Congdon*, 309 N.W.2d 261, 266 n.7 (Minn. 1981) (quotation omitted).

> Where the evidence as to testamentary capacity . . . is conflicting, findings of the [district] court with respect to such questions are final on appeal, even though the appellate court, if it had the power to try the questions [de novo], might determine otherwise upon reading of the record.

*In re Estate of Olson*, 227 Minn. 289, 295, 35 N.W.2d 439, 444 (1948). "[D]ue regard shall be given to the opportunity of the [district] court to judge the credibility of the witnesses." Minn. R. Civ. P. 52.01.

For a will to be valid, a testator must have testamentary capacity at the time of the will's execution. *In re Estate of Anderson*, 384 N.W.2d 518, 520 (Minn. App. 1986). To

5

have testamentary capacity, a "testator must understand the nature, situation, and extent of his property and the claims of others on his bounty or his remembrance, and he must be able to hold these things in his mind long enough to form a rational judgment concerning them." *In re Estate of Healy*, 243 Minn. 383, 386, 68 N.W.2d 401, 403 (1955). A will contestant has the burden to establish lack of testamentary capacity. Minn. Stat. § 524.3-407 (2014). Factors to be considered in determining whether a testator possesses testamentary capacity include: (1) the reasonableness of the property division; (2) the testator's conduct within a reasonable time before and after executing the will; (3) prior adjudications of the testator's mental capacity; and (4) expert testimony about the testator's physical and mental condition. *Anderson*, 384 N.W.2d at 520.

The district court found that Ingvalson had not met his burden of establishing that Harry lacked testamentary capacity when he executed the 2010 will. Specifically, the district court found: (1) Harry's "assets were not complex and he understood the nature, situation, and extent of his property on May 26, 2010"; (2) Harry "knew his family and understood the claims of others on his bounty on May 26, 2010"; and (3) Harry "was able to hold the nature of his property and the claims of others on his property in his mind long enough to form a rational judgment concerning them."

The district court's finding that Ingvalson had not met his burden of establishing that Harry lacked testamentary capacity when he executed the 2010 will is supported by evidence from the record and, thus, not clearly erroneous. First, Hammell testified that Harry was aware of all of his relatives and the extent of his property, and, based on his years of experience in dealing with Harry, he believed that Harry had the requisite

6

testamentary capacity to execute a will. Hammell's office staff also testified that they believed Harry was competent to execute a will. Second, at all three of their meetings, Harry consistently told Hammell that he wanted to replace Ingvalson and his sister with Beverly. Harry's explanation for the change, that he never saw Ingvalson and his sister and that Beverly was helping him, was reasonable. Finally, although Harry had been diagnosed with dementia and was under a conservatorship, neither of these facts precludes Harry from being able to execute a valid will. *See Congdon*, 309 N.W.2d at 267 (stating that "because testamentary capacity is a less stringent standard than the capacity to contract, it is not inconsistent for the subject of a conservatorship to have sufficient capacity to execute a will"). Multiple witnesses testified that Harry was able to live alone and was able to take care of himself with some assistance from family.

Ingvalson argues that there were material omissions in the district court's order, including that no findings were made regarding a determination of incapacity that occurred during the conservatorship action or Dr. Wymer's deposition testimony. We disagree. The district court's order included clear and comprehensive findings. The district court made several findings regarding the conservatorship action, including that Catholic Charities was initially appointed in 2002, but was later replaced in 2004 by Donald and Robert. The district court also made a finding regarding when Harry was diagnosed with dementia by Dr. Wymer and discussed the results of the exam that she administered.

Moreover, even if the district court had not made any findings, a district court is not required to make findings of fact explaining its decision where the order decides the

disputed facts. *See Crowley Co. v. Metro. Airports Comm'n*, 394 N.W.2d 542, 545 (Minn. App. 1986) (citing *Lafayette Club v. Roberts*, 196 Minn. 605, 611, 265 N.W. 802, 805 (1936)). In the conclusions of law portion of its order, the district court stated that "[t]he appointment of a conservator for [Harry] in 2002 was not determinative of [his] capacity to execute a will and did not preclude [him] from executing a valid will." This sentence shows that the district court weighed the fact that Harry was under a conservatorship, which would include the 2003 determination of incapacity. The district court also stated that "[Harry] being diagnosed with dementia did not prevent him from executing a valid will on May 26, 2010." This sentence shows that the district court weighed the fact that Harry had been diagnosed with dementia, which is what Dr. Wymer testified to at her deposition.

Next, Ingvalson argues that the district court clearly erred in weighing the evidence because it gave too much weight to Hammell's testimony and not enough weight to Ingvalson's expert's and family members' testimonies. However, the district court made specific credibility findings. *See* Minn. R. Civ. P. 52.01. In its order, the district court stated that, although the court considered Ingvalson's expert's testimony, the expert never spoke to Harry and only reviewed records and documents provided to him by Ingvalson. Further, the district court stated that it found Hammell's interactions with Harry to carry more weight than the expert's opinion. We defer to these credibility findings. *See Braith v. Fischer*, 632 N.W.2d 716, 724 (Minn. App. 2001), *review denied* (Minn. Oct. 24, 2001).

Finally, Ingvalson argues that the facts in this case are similar to the facts in other cases in which this court or the Minnesota Supreme Court has affirmed the district court's finding that decedent lacked testamentary capacity. For example, Ingvalson argues that this case is similar to *Anderson*, because both decedents were under a conservatorship, suffered from dementia, and their attorneys used the same technique for determining testamentary capacity. *See* 384 N.W.2d at 520-21. However, this comparison is flawed. In *Anderson*, and the other case Ingvalson cites to, this court and the supreme court have declined to reverse where there was conflicting evidence on the question of testamentary capacity and made reference to specific conditions only for the purpose of providing an evidentiary basis on which to affirm. *Id.*; *see also In re Estate of Luke*, 220 Minn. 104, 105-06, 19 N.W.2d 5, 6 (1945).

In sum, because there is evidence in the record supporting the district court's finding that Ingvalson failed to meet the burden of proving that Harry lacked testamentary capacity to execute the 2010 will, the finding is not clearly erroneous.

**Affirmed.**