**In re ESTATE OF Mary Victorine Carpenter TORGERSEN a/k/a Mary V. Torgersen.**

No. A05–1429.

Court of Appeals of Minnesota.

April 11, 2006.

Bruce W. Larson, Charles A. Beckjord, Law Office of Bruce W. Larson, Wayzata, MN, for appellant.

William M. Hart, Damon L. Highly, Timothy W. Ridley, Meagher & Geer, P.L.L.P., Minneapolis, MN, for respondent.

Considered and decided by WILLIS, Presiding Judge; SHUMAKER, Judge; and STONEBURNER, Judge.

## OPINION

STONEBURNER, Judge.

In this will contest, appellant argues that the district court clearly erred in determining that appellant did not meet his burden of proving that decedent's November 2002 will was the result of respondent's undue influence and did not meet his burden of proving that decedent lacked testamentary capacity. Appellant also challenges denial of his request for attorney fees under Minn.Stat. § 524.3–720 (2004).

## FACTS

Following her husband's death in 1971 until 2001, decedent Mary Torgersen lived in Indiana near one of her four daughters, EmCele Masbaum. Appellant Ned Masbaum is EmCele Masbaum's husband and is the nominated representative under a will executed by Torgersen in 1978.

The Masbaums provided significant non-financial assistance to Torgersen while Torgersen lived in Indiana. EmCele Masbaum provided transportation, assisted with shopping and cleaning, and managed Torgersen's finances. Appellant, a forensic psychiatrist, arranged for Torgersen's medical care and, by the mid–1990s, was Torgersen's primary physician until Torgersen moved to Minnesota.

In 2001, EmCele Masbaum's health problems prevented her from continuing to provide assistance to Torgersen. The Masbaums unilaterally decided that Torgersen would move to Minnesota to live with respondent David Groves and his wife, Andrea, who had previously invited Torgersen to live with them. Andrea Groves, one of Torgersen's four daughters, is a certified psychiatric nurse employed full time at Hennepin County Medical Center. Respondent is her husband and is the nominated personal representative under a will executed by Torgersen in November 2002.

In May 2001, when Andrea Groves arrived for one of her regular visits with Torgersen in Indiana, the Masbaums told Andrea Groves and Torgersen that Torgersen was moving to Minnesota the next day. The Masbaums had already purchased airline tickets for Torgersen's move. Andrea Groves and Torgersen worked into the night packing for the move and left for Minnesota the next day. A month later, the Masbaums brought Torgersen's remaining belongings to Minnesota. This is the last time that appellant saw Torgersen.

EmCele Masbaum last saw Torgersen when she visited Torgersen in Minnesota in September 2001 while the Groveses were away on a vacation. In a letter to

Torgersen, EmCele Masbaum described this as a "beautiful visit" and noted that Torgersen's "thinking [was] so good."

After EmCele Masbaum's September 2001 visit with Torgersen, the Masbaums wanted Torgersen to return to Indiana. Andrea Groves did not want Torgersen to return to Indiana. The relationship between Torgersen and the Masbaums, which apparently had been very good, began to deteriorate. The relationship between the Groveses and the Masbaums, which had never been good, also deteriorated.

The Masbaums claim that the Groveses kept Torgersen a virtual hostage in the Groveses' home and influenced her to disinherit EmCele Masbaum and Torgersen's two daughters who live in Florida. Torgersen became convinced that the Masbaums had "evicted" her from her home in Indiana in the middle of the night and had not delivered all of her personal property from Indiana. EmCele Masbaum, who retained control over Torgersen's finances when Torgersen moved to Minnesota, initially refused to release Torgersen's funds to pay for dentures that Andrea Groves helped Torgersen procure. The Groveses then assisted Torgersen in moving her funds to Minnesota. EmCele Masbaum, who held a power of attorney for Torgersen, retained control over a USAA financial account. In a struggle over control of this account, Torgersen became convinced that the Masbaums had taken funds from the account. Attorney David Porter assisted Torgersen and respondent in the preparation of a revocation of the power of attorney held by EmCele Masbaum and a document giving Torgersen's power of at-torney to respondent. The revocation was sent to USAA, but appellant sent a letter to USAA stating that Torgersen was incompetent to revoke the power of attorney. This prompted respondent and Torgersen, with respondent's assistance, to file professional complaints against appellant in Minnesota. After being informed that Minnesota did not have jurisdiction over appellant's professional license, Torgersen filed a professional complaint against appellant in Indiana. Respondent also assisted Torgersen in bringing a pro se lawsuit in federal court against appellant, which was later withdrawn. Respondent testified that he wrote "a lot of complaints" for Torgersen, who "knew how to state her complaints pretty well."

Appellant wrote a three-page letter to Torgersen on March 15, 2002, reminding her of all of the assistance EmCele Masbaum had given her over the years, demanding that she stop criticizing EmCele Masbaum to Andrea Groves, and accusing Torgersen of being ungrateful and self absorbed. The letter expresses the Masbaums' conclusion that "[EmCele] need[s] to rescue you, again," and concludes, "For your peace of mind, you need to come for the visit. This may be your last chance. If you don't and this is how you and those people want it; so be it. We will say Good-bye." Later, the Masbaums refused to give Torgersen's relatives the telephone number for the Groveses which prevented Torgersen from contacting her sister before her sister's death, causing Torgersen to become more upset with the Masbaums.[1]

---

1. The Groveses had turned off the ringer to Torgersen's telephone. Appellant asserts that this action is evidence of Torgersen's virtual hostage position in their household. Andrea Groves testified that she turned off the ringer at Torgersen's request due to EmCele Masb- aum's numerous telephone calls. She testified that Torgersen knew how to turn the ringer on and off. Respondent testified that Torgersen used her telephone "all the time" until a day or two before she died.

In June 2002, Torgersen executed a will that specifically excluded EmCele Masbaum. In August 2002, Torgersen revised the will to exclude all of her daughters except Andrea Groves. In November 2002, Torgersen revised her will at her attorney's suggestion to add the USAA account as a probate asset.

Torgersen died in April 2003 at the age of 93. Respondent petitioned for probate of the November 2002 will. Appellant objected and petitioned for probate of Torgersen's 1978 will that nominated him personal representative and devised the estate equally to the four daughters. Appellant asserted that Torgersen lacked testamentary capacity when the November 2002 will was executed and was unduly influenced by the Groveses in making that will.

After a five-day trial, a referee concluded that appellant had failed to meet his burden of proving undue influence or lack of testamentary capacity and ordered probate of the November 2002 will. The district court affirmed the referee's findings and order and denied appellant's request for attorney fees under Minn.Stat. § 524.3–720 (2004). This appeal followed.

## ISSUES

1. Was the district court's finding that appellant failed to establish that decedent was unduly influenced in the making of her November 2002 will clearly erroneous?

2. Was the district court's finding that appellant failed to establish that decedent lacked testamentary capacity when she made the November 2002 will clearly erroneous?

3. Did the district err by concluding that, as a matter of law, appellant is not entitled to attorney fees under § Minn.Stat. 524.3–720 (2004)?

## ANALYSIS

### I. Standard of review

■ The contestants of a will have the burden of proving lack of testamentary capacity and undue influence. Minn.Stat. § 524.3–407 (2004). On appeal from a probate court's decision after a trial without a jury, findings of fact will be disturbed only if clearly erroneous. Minn. R. Civ. P. 52.01; *In re Estate of Olsen*, 357 N.W.2d 407, 411 (Minn.App.1984), *review denied* (Minn. Feb. 27, 1985). A finding is clearly erroneous if this court "is left with the definite and firm conviction that a mistake has been committed." *In re Estate of Balafas*, 293 Minn. 94, 96, 198 N.W.2d 260, 261 (1972) (quotation omitted).

■ Generally this court reviews a denial of attorney fees under an abuse-of-discretion standard. *See In re Estate of Van Den Boom*, 590 N.W.2d 350, 354 (Minn.App.1999) (stating that "this court will not reverse a district court's denial of attorney fees unless there has been an abuse of discretion"), *review denied* (Minn. May 26, 1999). In this case, however, the district court's denial of appellant's request for attorney fees was based on the district court's application of a statute to the facts. The construction and application of a statute is a question of law, which this court reviews de novo. *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 393 (Minn.1998).

### II. Undue Influence

■ To invalidate a will for undue influence, a contestant must show that another person exercised influence at the time the testator executed the will to the degree that the will reflects the other person's intent instead of the testator's intent. *In re Estate of Reay*, 249 Minn. 123, 126, 81 N.W.2d 277, 280 (1957). Conjecture and suspicion are insufficient to prove un-

due influence. *Id.; In re Estate of Novotny*, 385 N.W.2d 841, 843 (Minn.App.1986) (holding will contestant's burden of establishing undue influence was not met merely by relying on presumption of undue influence). The evidence must show that the influence exerted "was so dominant and controlling of the testator's mind that, in making the will, he ceased to act of his own free volition and became a mere puppet of the wielder of that influence." *In re Estate of Congdon*, 309 N.W.2d 261, 268 (Minn.1981) (quotation omitted).

■ Courts consider several factors when determining whether a testator was unduly influenced, including (1) an opportunity to exercise influence; (2) the existence of a confidential relationship between the testator and the person claimed to have influenced the testator; (3) active participation by the alleged influencer in preparing the will; (4) an unexpected disinheritance or an unreasonable disposition; (5) the singularity of will provisions; and (6) inducement of the testator to make the will. *In re Estate of Peterson*, 283 Minn. 446, 449, 168 N.W.2d 502, 504 (1969); *In re Estate of Wilson*, 223 Minn. 409, 413, 27 N.W.2d 429, 432 (1947).

■ The record supports the district court's findings that the Groveses had a confidential relationship with Torgersen and the opportunity to exercise influence. Appellant speculates that the Groveses selected Torgersen's attorney to assist them in a plan to disinherit EmCele Masbaum. The evidence, however, demonstrates that Torgersen's initial contact with attorney David Porter occurred in March 2002 in connection with the dispute over control of the USAA account. Porter was selected from among the names of several attorneys provided by the Groveses' daughter, who is also an attorney. Porter testified that he met with Torgersen and, at her request, prepared documents to revoke the power of attorney held by EmCele Masbaum and grant power of attorney to respondent.

Porter testified that he first met with Torgersen at the Groveses' home in June 2002 to discuss a will, and he met with Torgersen alone. He described Torgersen as "just as alert and aware as anyone that I've ever known. She was just a joy to meet and to talk with." The June 2002 will is the first will that expressly excluded EmCele Masbaum. Porter testified that Torgersen discussed with him why she wanted to exclude EmCele Masbaum from her will.

When Torgersen amended her will in August 2002 to additionally exclude two daughters who live in Florida, Torgersen and Porter again met alone. At trial, Porter could not recall the precise reason Torgersen gave him for wanting to exclude these daughters, and thought it had something to do with a daughter's disability, but Porter found the reason to be rational and Torgersen to be competent.[2]

Porter testified that Torgersen decided to amend the will in November 2002 at his suggestion that a specific provision concerning the USAA account be added to the will. Porter testified that this was the only change to the will made in November 2002. He testified that he reviewed the terms of each will with Torgersen and had her confirm her agreement with the terms. Porter testified that he understands the standard for legal competence in Minnesota and that "at the execution of each of these wills, I believed [Torgersen] to be competent." Porter testified that he is

---

2. Andrea Groves testified that Torgersen removed her other two daughters from her will after visiting them in Florida and learning that an inheritance could disqualify them from public-assistance benefits.

very aware of the issue of undue influence and never sensed any undue influence being exerted by the Groveses on Torgersen.

Stephan and Elizabeth Damian witnessed Torgersen's November 2002 will. The Daminans are friend of the Groveses. Elizabeth Damian is a psychiatric nurse who worked with Andrea Groves at the Hennepin County Medical Center. Stephan and Elizabeth Damian met Torgersen soon after she came to live with the Groveses, and each had talked with Torgersen on occasions when the Groveses were not present. They testified that they never sensed any undue influence by the Groveses over Torgersen and did not sense any lack of competence on Torgersen's part when they interacted socially with her or when they witnessed the signing of the will.

Although appellant accuses respondent of making it his "full time job" to exercise influence over Torgersen and asserts that the Groveses' "angry fits" and "dominat[ion]" of Torgersen induced Torgersen into excluding her other daughters from her will, there is significant evidence in the record that Torgersen's attitude toward the Masbaums resulted from Torgersen's perception of the Masbaums' actions toward and communications with Torgersen. The evidence demonstrates that the Groveses shared Torgersen's perceptions, but there is no evidence that these attitudes originated with the Groveses or were motivated by a plan to have Torgersen disinherit EmCele Masbaum. Appellant asserts that it was "abnormal" for Torgersen to disinherit three of her daughters, but the evidence in the record of Torgersen's feelings about the Masbaums demonstrates a basis for Torgersen's decision regarding the Masbaums. And there is evidence that Torgersen believed that an inheritance would not benefit her daughters in Florida. Based on our careful re-

view of the entire record, we are unable to conclude that the district court's finding that appellant failed to meet the burden of proving undue influence is clearly erroneous.

### III. Testamentary Capacity

■ Testamentary capacity exists if the testator knows "the nature, situation, and extent of [her] property and the claims of others on [her] bounty ... and [she] must be able to hold these things in [her] mind long enough to form a rational judgment concerning them." *In re Estate of Healy*, 243 Minn. 383, 386, 68 N.W.2d 401, 403 (1955). Factors to be considered in determining whether a testator possesses testamentary capacity include (1) the reasonableness of the property disposition; (2) the testator's conduct within a reasonable time before and after executing the will; (3) a prior adjudication of the testator's mental capacity; and (4) expert testimony about the testator's physical and mental condition. *In re Estate of Anderson*, 384 N.W.2d 518, 520 (Minn.App. 1986).

■ Regarding the reasonableness of the property disposition, as discussed above, evidence of the nature of the relationships between Torgersen and the Masbaums, and evidence of Torgersen's understanding of the effect an inheritance would have on benefits received by her daughters who live in Florida, provides a context for Torgersen's devise of her property that is not unreasonable from her perspective.

Concerning conduct before and after execution of the will, appellant argues that Torgersen's conduct in the months following the November 2002 will shows that she lacked testamentary capacity. He refers to a December 2, 2002 conservatorship hearing in which Torgersen appeared to be

"very confused"[3] and documents signed by Torgersen requesting that the Masbaums be prosecuted for trespass if they attended her funeral.[4] Porter testified that Torgersen's appearance at the conservatorship hearing was dissimilar to how she appeared when he saw her on other occasions and that, in his opinion, Torgersen was competent when she executed her June, August, and November 2002 wills.

Regarding expert testimony, appellant relies on his own diagnosis and the diagnosis of "pseudodementia" by a psychologist in March 2003. But Dr. Kiefer, Torgersen's treating physician in Minnesota, testified that Torgersen spoke for herself during her visits with him and did not appear to be influenced by Andrea Groves even when Groves was present during a doctor visit. His office notes of Torgersen's visits in August 2002 state that she was "coherent," "alert," and "oriented." Notes of an October 2002 visit state that Torgersen was "lucid." Dr. Kiefer wrote a letter three days after the November 2002 will was executed stating that "Mrs. Torgersen is capable of making rational decisions but is not capable of handling her finances and other such things. She definitely needs somebody to supervise her affairs, and she certainly is capable of naming an appropriate person for this capacity."[5] Dr. Kiefer testified that a note by an emergency-room physician dated December 26, 2002, states: "The patient is very alert, very oriented, has intact memory, knows her medications very well,

knows where she took them last, knows when she took them last." At trial, when Dr. Kiefer was given the legal definition of testamentary capacity, he opined that Torgersen had capacity to execute her wills.

In March 2003, Torgersen underwent a neuropsychological evaluation at Park Nicollet Clinic performed by licensed psychologist Michael J. Furhman, Ph.D., a board-certified clinical neuropsycholgist. Dr. Furhman's letter-report dated April 1, 2003, demonstrates that he was aware of the controversy between the Groveses and the Masbaums and their differing views about who was exploiting Torgersen. The report notes that he was hampered in receiving a full medical history by Torgersen's request that information not be exchanged with the Masbaums.

Despite finding that Torgersen's cognitive abilities were impaired, which Dr. Furhman attributed one-half to organic factors and the other half as being "tantamount to pseudodementia," Dr. Furhman concluded that Torgersen "does not show the level of cognitive impairment that ordinarily militates for legal intervention (e.g., conservatorship), assuming that informal sources of support and supervision are available and suitable to meet her needs." Dr. Furhman's report also stated that Torgersen "should not act unilaterally in matters of complexity or consequence."

▬ We have previously noted that "[l]ess mental capacity is required to make a will than to conduct regular business

---

3. The conservatorship action was dismissed by Porter because he determined that the evidence did not support the petition.

4. Respondent testified that he drafted this document at Torgersen's request, noting that Torgersen had barred some of her husband's friends from his funeral for perceived slights.

5. Torgersen frequently commented about the disintegration of her relationship with the

Masbaums during her doctor visits. Appellant asserts that because Torgersen's accusations and paranoia about the Masbaums was unfounded, these complaints undermine the doctor's testimony that Torgersen was lucid. But no authority supports the proposition that a decedent's mistaken belief about the motives of her children is evidence of, or establishes, lack of testamentary capacity.

affairs." *In re Estate of Prigge*, 352 N.W.2d 443, 444–45 (Minn.App.1984) (citing *Congdon*, 309 N.W.2d at 267); *see also In re Estate of Lange*, 398 N.W.2d 569, 572 (Minn.App.1986) (stating that a decedent's "inability to negotiate a farm rental contract is not determinative of her testamentary capacity"). And even a person under a conservatorship may have sufficient capacity to execute a will. *Congdon*, 309 N.W.2d at 267.

Appellant asserts that Dr. Kiefer "did not testify that he had expertise, training or experience in determining testamentary capacity" and asserts that his testimony was more credible because he is a forensic psychiatrist, and "determining competency is exactly what he does." Credibility determinations, however, especially when experts are involved, are within the discretion of the factfinder. *See In re Joelson*, 385 N.W.2d 810, 811 (Minn.1986) ("Where the findings of fact rest almost entirely on expert opinion testimony, the [district court's] evaluation of credibility is of particular significance."). Significantly, appellant last saw Torgersen in June 2001, approximately 17 months prior to execution of the November 2002 will. At the time Torgersen was under his care, appellant had not rendered any opinion that her mental capacity was diminished. Dr. Kiefer regularly examined Torgersen during the last two years of her life, before and after the execution of the November 2002 will. Based on the evidence in the record, we cannot conclude that the district court's credibility findings are clearly erroneous. Because there is evidence in the record supporting the finding that appellant failed to meet the burden of proving that Torgersen lacked testamentary capacity to execute the November 2002 will, the finding is not clearly erroneous.

### IV. Attorney Fees

 The district court denied appellant's request for attorney fees based on its determination that appellant is not the personal representative of Torgersen's estate.

Minn.Stat. § 524.3–720 (2004) provides:

Any personal representative or person nominated as personal representative who defends or prosecutes any proceeding in good faith, whether successful or not, or any interested person who successfully opposes the allowance of a will, is entitled to receive from the estate necessary expenses and disbursements including reasonable attorneys' fees incurred.

This provision allows not only personal representatives to recover attorney fees, but also specifically allows "nominated" personal representatives to recover, whether or not the will in which they are nominated is admitted to probate. By including "nominated" personal representatives as well as personal representatives, the statute contemplates persons who have been nominated as personal representatives in wills that have not been admitted to probate prosecuting or defending will contests and recovering the expenses of that litigation, so long as they act in good faith. *See In re Estate of Evenson*, 505 N.W.2d 90, 92 (Minn.App.1993) (deciding that an unsuccessful personal representative defending or prosecuting an action in good faith may recover attorney fees and expenses because "[r]ecovery of costs and attorney fees in will contests must not depend upon whether the will is found to be valid after litigation").

 The Uniform Probate Code's commentary to the section that became Minn. Stat. § 524.3–720 points out that as a fiduciary for the estate's successors, a person named as personal representative in a will that has not yet been probated is an interested person who may contest a will. *See*

Unif. Probate Code § 3–720 cmt. (amended 1993), 8 U.L.A. 184 (1998). The comment notes that this observation applies "to the case where the named executor of one instrument seeks to contest the probate of another instrument." *Id.* Even if a will is challenged before it is admitted to probate, a nominated personal representative has a duty to defend a seemingly valid will in a contest and to collect attorney fees incurred in that effort. *See In re Estate of Killen*, 188 Ariz. 569, 937 P.2d 1375, 1380–81 (1996) (holding that a nominated personal representative who unsuccessfully defended a will would be entitled to attorney fees unless probate court found he acted in bad faith). In this case, appellant defended a seemingly valid 1978 will against what he perceived to be an invalid subsequent will.

■■■■■■ The public policy underlying this statute "recognize[s] that an estate as an entity is benefited when genuine controversies as to the validity or construction of a will are litigated and finally determined." *In re Estate of Flaherty*, 484 N.W.2d 515, 518 (N.D.1992). The statute allows a nominated personal representative, as a fiduciary acting on behalf of the estate, to, in good faith, pursue appropriate legal proceedings without having to risk personal financial loss by underwriting the proceeding's expenses. *Id.; see also In re Estate of Healy*, 247 Minn. 205, 209, 76 N.W.2d 677, 680 (1956) (stating that a personal representative is under a duty to ensure that the estate's assets are not diverted from the course the testator prescribes). We conclude that the district court erred in determining that, as a matter of law, appellant was not entitled to attorney fees under the statute.

Whether a person challenging a will is acting in good faith is a question of fact.

*See Evenson*, 505 N.W.2d at 91 (reviewing a district court's finding of good faith under the clearly erroneous standard); *see also In re Estate of Herbert*, 91 Hawai'i 107, 979 P.2d 1133, 1135 (1999) (stating that the existence of good faith under this section is a fact question for a trial court to consider); *In re Estate of Olson*, 479 N.W.2d 610, 614 (Iowa Ct.App.1991) (same). In this case, the district court did not reach the issue of good faith or reasonableness of the fees claimed. Therefore, we reverse the denial of attorney fees requested by appellant and remand to the district court for a determination of whether appellant acted in good faith and, if so, for a determination of the reasonableness of the fees requested.

## DECISION

Because the evidence is sufficient to support the district court's determination that appellant did not meet the burden of proving undue influence or lack of testamentary capacity, we affirm those determinations and the order admitting the November 2002 will to probate. Because the district court erroneously concluded that appellant was not entitled to attorney fees under Minn.Stat. § 524.3–720 (2004), we reverse the denial of appellant's request for attorney fees and remand for a determination of whether appellant acted in good faith and, if so, the reasonableness of the fees claimed.

**Affirmed in part, reversed in part, and remanded.**