*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1347**

In re: Estate of Loretta M. Chisholm, Decedent.

**Filed July 6, 2015
Affirmed
Hudson, Judge**

Clay County District Court
File No. 14-PR-12-4412

Daylen D. Ramstad, Johnson, Ramstad & Mottinger, PLLP, Fargo, North Dakota (for appellants Barbara Seelhammer, Darcy Nordick, Daryl Chisholm, SuRae Schmidt)

Berly D. Nelson, Ian R. McLean, Serkland Law Firm, Fargo, North Dakota (for respondent Kevin Chisholm)

Michael T. Andrews, Ann E. Miller, Anderson, Bottrell, Sanden & Thompson, Fargo, North Dakota (for respondent Randal Chisholm)

Considered and decided by Hudson, Presiding Judge; Kirk, Judge; and Smith, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HUDSON**, Judge

In this probate appeal, appellants challenge the district court's order allowing findings that when the decedent executed a new will shortly before her death she lacked testamentary capacity and was unduly influenced. Because the district court did not clearly err in finding that respondents met their burden to show the decedent was unduly influenced, we affirm.

# FACTS

Appellants and respondents are the adult children of decedent Loretta Chisholm. Appellants Barbara Seelhammer (Barb), Darcy Nordick (Darcy), Daryl Chisholm (Daryl), and SuRae Schmidt (SuRae) contest the district court's decision that their mother, Loretta, lacked testamentary capacity and was unduly influenced to execute a new will on September 21, 2012. Respondents Kevin Chisholm (Kevin) and Randal Chisholm (Randal) request that this court uphold the district court's decision to enter Loretta's May 14, 2010 will into probate. The dispute centers around the distribution of Loretta's assets, primarily her farmland and stock.

Loretta's husband James died in 1994, creating through his will two trusts containing most of their farmland. Loretta was the sole income beneficiary of these trusts and held a special power of appointment for the first trust. Daryl, Barb, Darcy, and SuRae did not receive land under James's trusts. Daryl and Randal were appointed trustees, but Daryl resigned in 1997 in exchange for the forgiveness of a loan and had little contact with Loretta after he resigned.

Loretta's long-time attorney, Tom Opheim, prepared a will that Loretta executed on May 14, 2010; Opheim retired shortly thereafter. In Loretta's May 2010 will, she left the bulk of the farmland to Randal and Kevin who had essentially taken over the farming business. Although Daryl had advocated for equal distribution, Loretta considered the previous debt forgiveness and the sale of land to him—for which he would be reimbursed half the sale price upon Loretta's death—his inheritance. The daughters were not to receive any land because they were not involved in farming. This distribution was

2

generally consistent with the estate plan that Loretta and James prepared before James's death.

With respect to Byron, Loretta had little contact with him in the years before her death and ultimately sued him in bankruptcy court to obtain a non-dischargeable judgment because of a debt he incurred through false pretenses. She paid $350,000 in Byron's bankruptcy proceeding. Loretta's once positive relationship with Randal became strained in the last years of her life, and Loretta asked him to step down as trustee in April 2011. Loretta continued a positive relationship with Kevin, however, and he remained a trustee. She also had a "generally close" relationship with her daughters, giving Darcy health care power of attorney, and requesting that Barb and Kevin act as her personal representatives.

In September 2010, Loretta met with attorney Ken Norman (Norman) to update her estate plan. Loretta had met Norman at an estate-planning workshop she attended with Barb. Norman eventually sent Loretta a letter stating that he understood she wanted to leave the land held in her name and the land and stock from the trust to Kevin, and that her home and personal property would go to her daughters. Nearly two years later, on July 3, 2012, Norman sent Loretta a draft will and living trust representing this disposition. On July 10, 2012, Barb called Norman, whom she knew because their children attended activities together, and told him that Daryl overheard Kevin threatening Loretta about signing her will, that Kevin had issues with insurance and the government based on fraud (although she later admitted she had no factual basis for these claims), and that Barb had a document that Loretta was comfortable with, showing where Loretta's

3

assets should go. Norman discussed Loretta's estate with Barb, Daryl, and Byron in August 2012. Norman informed Loretta he was concerned about undue influence from her children since the bulk of the estate was going to Kevin, but Norman acknowledged that these concerns arose from the terms of the estate plan and not from Kevin's actions.

As late as May 2012, Loretta told Norman that her daughters were not to get any farmland. On August 21, 2012, Kevin took Loretta to an appointment that Loretta had scheduled with Norman. At the August 21 meeting, Norman noted that Loretta stated that Daryl, Byron, and Darcy had "it in for Kevin," and that Loretta still wanted the bulk of her assets to go to Kevin. Darcy admits that, the day before this meeting, she gave Loretta a letter implying that Darcy would keep her own son away from Loretta if she did not "understand" about Kevin.

On August 22, 2012, all of Loretta's children, except Kevin, met with Norman at an appointment Barb set up. The day after the meeting, some of the siblings made a vulnerable-adult complaint to social services and the police, claiming that Kevin had "dragged" Loretta to Norman's office. Loretta was hospitalized for a urinary tract infection. Kevin was not notified of her hospitalization then, and Darcy and Barb did not allow Loretta to have any visitors besides themselves. Upon Loretta's discharge, Darcy and Barb began 24-hour supervision of Loretta. They placed baby monitors in Loretta's home, which Barb kept on when she was not with Loretta. Barb and Darcy had access to and reviewed all of Loretta's legal documents, even though Barb admitted that Loretta did not give her permission to look at legal documents.

4

Barb and Darcy controlled Loretta's visitors, but allowed their siblings, with the exception of Kevin, to visit. Kevin made numerous attempts to call and visit Loretta but was not allowed to see her until October 1, 2012.

Loretta was hospitalized again from September 5-11, 2012 for shortness of breath and weakness. The medical records show that Loretta was steadily declining at this time, and after discharge she began hospice care and was prescribed medications which can cause confusion and mood change. Barb and Darcy decided stress was a factor in Loretta's declining health, and, after Loretta's hospice admission implemented a "no business talk policy" for visitors and continued to monitor Loretta's conversations. Darcy admitted that Barb threatened Kevin he would never see Loretta alive again if he tried to talk business with her.

Barb asked Norman to come see Loretta on September 18, 2012, which he did, sending Loretta a draft will the next day. In this draft will, the bulk of the farmland was devised to the daughters and Daryl; Kevin received very little land; Byron was essentially excluded, and Randal was completely disinherited. Although the September 19, 2012 hospice notes indicate that Barb and Darcy would not allow Loretta to see the hospice chaplain because she needed to "conserve her energy," Barb set up an appointment for Loretta two days later to have the will signed. Present at the will-signing were Norman, Loretta's other attorney, David Johnson, and an assistant from his office. Norman stated that he went through the will provisions, and that neither he nor any of the witnesses were aware of any medications Loretta was taking. In addition, Loretta's sister testified that Loretta seemed herself around this time.

Kevin was allowed to visit Loretta on October 1, 2012, and she told him that she had devised the daughters 80 acres, an amount significantly smaller than the new will actually devised to them. Loretta died on October 22, 2012.

The district court found that Daryl, Barb and Darcy "actively participated and induced the creation of the September 2012 will" and that the changes in the will were against the intentions Loretta had expressed for years. The district court found Barb and Darcy's claims that they did not know the new will's content not credible since they were opening Loretta's mail and admitted to reviewing Loretta's legal documents. Further, the district court found that the new "beneficiaries had been trying to convince Loretta to change her [w]ill to benefit them, they knew they would not receive any of the farmland under previous [w]ills, and they were able to isolate Loretta and take control of her life." The district court held the September 2012 will to be invalid because Loretta lacked testamentary capacity due to her declining health and because she was unduly influenced by the beneficiaries. This appeal follows.

## DECISION

Appellants argue that the district court clearly erred when it determined that Loretta was subject to undue influence when she signed the September 2012 will. We review a district court's findings of undue influence for clear error. *In re Estate of Larson*, 394 N.W.2d 617, 620 (Minn. App. 1986), *review denied* (Minn. Dec. 12, 1986). We will not overturn a district court's findings unless, after reviewing the entire record, we are "left with the definite and firm conviction that a mistake has been committed." *In re Estate of Anderson*, 384 N.W.2d 518, 520 (Minn. App. 1986) (quotation omitted). A

will contestant must prove undue influence by clear and convincing evidence, showing that at the time the will was made there was "such dominant and persuasive force that the will of the person exercising it is substituted for the will of the testator whereby the resulting written testament expresses the intent and purpose of that person and not that of the testator." *In re Estate of Reay*, 249 Minn. 123, 126, 81 N.W.2d 277, 280 (1957). Suspicion and conjecture of undue influence are insufficient. *In re Estate of Novotny*, 385 N.W.2d 841, 843 (Minn. App. 1986).

Courts consider several factors in determining whether there was undue influence, including:

> (1) an opportunity to exercise influence;
> (2) the existence of a confidential relationship between the testator and the person claimed to have influenced the testator;
> (3) active participation by the alleged influencer in preparing the will;
> (4) an unexpected disinheritance or an unreasonable disposition;
> (5) the singularity of will provisions; and
> (6) inducement of the testator to make the will.

*In re Estate of Torgersen*, 711 N.W.2d 545, 551 (Minn. App. 2006), *review denied* (Minn. June 20, 2006).

Appellants first argue that Barb, Darcy, and Daryl did not have sufficient opportunity to exercise influence over Loretta and that the district court mischaracterized Barb and Darcy's 24-hour care of Loretta. We disagree. The daughters admitted to opening Loretta's mail, looking at her legal documents without specific permission, and monitoring Loretta 24 hours per day, including determining when and which visitors

7

were allowed. Although appellants argue that Kevin did not provide proof that his calls were actually being screened or that he was kept from visiting in person, the district court implicitly found Kevin's testimony credible, and we discern no clear error in this finding.

Appellants also argue that others influenced Loretta; for example, they blame Kevin for mortgaging Loretta's house to pay off Byron's contract for deed. But Kevin testified that he only proposed the idea to mortgage the home instead of farmland, and that Loretta made the final choice.

Appellants further argue that, while the daughters may have had a confidential relationship with Loretta, this relationship did not extend beyond necessary caregiving duties. But the district court found that the daughters were essentially controlling Loretta from the time she returned home from the hospital in August 2012 until her death. They were reading all her mail, monitoring all of her communications, and prohibiting any "business talk" except when Barb made an appointment for Loretta to sign the new will. In addition, Darcy held medical power of attorney for Loretta. These facts amply support the existence of a confidential relationship.

Third, appellants claim that they did not participate in preparing the September 2012 will because Loretta independently hired Norman and they were not present when Loretta discussed her will with Norman or her previous attorney, Johnson. But the district court found that, after Norman sent Loretta an updated will draft prior to the execution of the September 2012 will, it is likely that Barb read the draft. She also had direct contact with Norman, including telling Norman that she had a document setting forth where Loretta's assets should go and that Loretta was comfortable with it. Further,

8

the day after Norman received Barb's call, Norman sent a letter to Loretta saying that he understood Loretta wanted further changes. But his notes reflect that he did not discuss these changes with Loretta, despite his initial claim that this letter was based on a conversation with Loretta. Norman's notes also indicate that both Barb and Daryl called him several times and that Daryl's attorney called him as well. The notes also indicate that Norman had a conference call with all the children except Kevin. Additionally, Barb requested that Norman bring the September 2012 will to Loretta's home to be signed. We conclude that appellants actively participated in preparing the September 2012 will.

Appellants next argue that there was no unexpected disinheritance or disposition, while respondents argue that Kevin's significant decrease in land and Randal's disinheritance demonstrates undue influence. "An entire change from former testamentary intentions is a strong circumstance to support a charge of undue influence." *In re Olson's Estate*, 227 Minn. 289, 298, 35 N.W.2d 439, 446 (1948). Additionally, a second will made by an ill person that varies from a will made when her "faculties were in their full [v]igor" leads to a presumption of undue influence. *Id.* (quotation omitted). Here, Loretta had long expressed her intent that the majority of the farmland would go to Kevin and that no farmland would go to her daughters. Appellants argue that Loretta regularly made changes to her will drafts, depending on her changing relationships with her children. But the record is clear that Kevin never fell out of favor with Loretta, and the other changes were relatively minor. And Loretta expressed no prior intent to completely disinherit Randal. The September 2012 will is a significant departure from Loretta's previously expressed intent and her May 2010 will. Moreover, the new will

9

was executed shortly before Loretta's death. These facts all support the district court's determination that Loretta was unduly influenced to execute the September 2012 will.

The parties next dispute the meaning of the fifth *Torgersen* factor—"the singularity of the will provisions." Appellants argue this factor does not favor undue influence since Loretta did not leave her property to just one or two of her children. Respondents claim that "singularity" refers to a change in a long-established pattern. While "singul" can mean being "only one," it is also defined as "[a] trait marking one as distinct from others." *The American Heritage Dictionary* 1685 (3d ed. 1996).. The singularity factor in undue influence generally refers to the nature and extent of changes in a new will from the testator's previous will. *See In re Estate of Overton*, 417 N.W.2d 653, 658 (Minn. App. 1988) (noting that a conclusion of singularity was unwarranted when there was only a small change in wills regarding the disposition of household goods). Here, Loretta had several previous drafts of wills that left the majority of farmland to Kevin; the September 2012 will was "singular" in that it left farmland to her daughters, disinherited Randal, and re-inherited Daryl.

Finally, appellants assert that Loretta was "headstrong" and that while she may have been influenced by her children, respondents did not show by clear and convincing evidence that she was *unduly* influenced. While the district court did not acknowledge Loretta's sister Norma's testimony that Loretta was "herself" around the time she executed the September 2012 will, there is sufficient evidence in the record that Loretta was unduly influenced to execute the new will: Barb summoned Norman to the house so Loretta could sign the will, even though Loretta had previously made her own

appointments; Barb and Darcy controlled all visitors and would not allow any business talk, making an exception only for the signing of the new will; and Daryl regularly attempted to convince Loretta to evenly distribute the property. While appellants argue that Kevin would have been completely disinherited if they had unduly influenced Loretta, this argument is not persuasive in light of the entire record.

In sum, the district court made extensive findings of fact regarding undue influence and succinctly summarized and analyzed the facts based on the testimony and exhibits. While appellants point to evidence that could have been interpreted differently or findings that are not wholly consistent, the overwhelming majority of the evidence supports the district court's findings and conclusions. Based on the six *Torgerson* factors, appellants have not shown that the district court's findings of fact that Loretta was unduly influenced are clearly erroneous. To the contrary, this is a textbook case of undue influence: Loretta's original 2010 will was consistent with her long-expressed intent, and the terms of that will stayed substantially the same from 2010 until as late as July 3, 2012, when Norman sent her a letter updating her estate plan, noting that the bulk of her assets were still going to Kevin. Then, one week later, Barb contacted Norman informing him of a new distribution significantly changing Loretta's previous dispositions and favoring the daughters and Daryl. While Kevin still received some assets under the new will, it was significantly less than under the original provisions. Moreover, Loretta was under constant care of the daughters when she signed the new will and essentially isolated from everyone except the daughters and Daryl. Thus, the district court did not clearly err in finding undue influence.

Appellants also claim that the district court clearly erred by finding that Loretta lacked testamentary capacity when she executed the September 2012 will. Because we conclude that the September 2012 will was invalid because Loretta was unduly influenced, we need not reach this issue.

**Affirmed.**